708 So.2d 703 (1998)
STATE of Louisiana
v.
Jimmy WILLIAMS.
No. 96-KA-1023.
Supreme Court of Louisiana.
January 21, 1998.
Rehearing Denied February 20, 1998.
As Revised May 28, 1998.
*707 Marilyn Michele Fournet, Baton Rouge, for Applicant.
Richard P. Ieyoub, Attorney General, Douglas P. Moreau, District Attorney, John *708 W. Sinquefiled, Gwendolyn K. Brown, John A. Cannon, Kenner, for Respondent.
KIMBALL, Justice.[*]
On July 13, 1994, an East Baton Rouge Parish grand jury indicted Jimmy Ray Williams for the first degree murder of Gordon Lawless in violation of La. R.S. 14:30. After a trial by jury, the defendant was found guilty as charged. After a sentencing hearing, the same jury that determined the issue of guilt, unanimously returned a verdict of death, finding as a single aggravating circumstance that the defendant was engaged in the perpetration of an attempted armed robbery. The trial judge sentenced the defendant to death in accordance with the jury's recommendation.
On direct appeal to this court,[1] the defendant raises one hundred twenty-nine errors and seeks a reversal of his conviction and sentence. Finding no reversible errors, we affirm the defendant's conviction and sentence.

FACTS
On June 15, 1994, the defendant and a 15year-old acquaintance, Travis Hampton, decided to rob a 688 Auto Parts delivery truck driven by Gordon Lawless. Lawless had just finished making a delivery to the 688 Auto Parts store on Government Street in Baton Rouge and was filling out paper work in the cab of his truck in the parking lot when the defendant approached the driver's side door and asked him for a cigarette. Lawless gave the defendant a pack of cigarettes and told him to take one; the defendant removed a cigarette from the pack and handed the pack to Hampton who also removed a cigarette. As he returned the pack to Lawless, the defendant pulled out a nine-millimeter handgun and demanded money. Lawless did not respond, and the gun fired. The single shot, traveling generally from left to right, struck Lawless on the left side of the mouth, traveled into the oral cavity, where it fractured two teeth and part of the jaw. The bullet then lacerated the tongue, perforated the jugular vein, and lacerated the internal cartoid artery before exiting behind Lawless's ear. Lawless drowned in his own blood. The defendant and Hampton then fled the scene.
The following day, detectives received an anonymous tip implicating the defendant in the incident. Acting on the tip, the officers picked up the defendant at his girlfriend's apartment and took him to the police station for questioning. There, he denied any involvement in the shooting and was released.
Later that evening, officers learned of Hampton's possible involvement in the shooting. Hampton turned himself in and implicated the defendant as the triggerman. The following day, the police arrested the defendant and again brought him to the station for questioning. The defendant then gave the officers another statement, admitting that he shot Lawless, but claiming that the gun discharged accidentally when he slipped while attempting to climb up to the driver's door of the truck.[2]
During the investigation, detectives also learned from Hampton about the defendant's involvement in the shooting of Earl Maples, a local funeral home director, hours before the Lawless shooting. Maples, who survived the shooting, testified that the defendant flagged him down as he ran errands in preparation for a fishing trip with a friend. The defendant requested a ride and, Maples consented. As Maples drove, the defendant engaged Maples in conversation and asked Maples how much money he had with him. Maples, who had several hundred dollars in the truck, responded that he had about thirty dollars on his person. The defendant then pulled out a gun and ordered Maples out of the truck. After Maples surrendered the money in his pocket, the defendant demanded that Maples also relinquish the keys to the truck. Maples attempted to escape on foot but the defendant caught him and ordered him back to the truck. Maples returned to the truck, *709 reached for a gun he had hidden under the seat, and turned to confront the defendant. The defendant shot Maples in the head and fled the scene. Maples was subsequently unable to identify the defendant as the shooter in a photographic lineup, but later claimed that he in fact recognized the defendant but was afraid to identify him. Fingerprints recovered from the truck matched the defendant's prints. Evidence of the Maple's robbery was admitted during the guilt phase pursuant to State v. Prieur, 277 So.2d 126 (La.1973). At the trial's penalty phase, the defendant admitted shooting Maples.
The jury found the defendant guilty of the first degree murder of Gordon Lawless on May 10, 1995. The following day, it returned a death verdict.

Assignment of Error Numbers 21, 22, 23, 30, 31, 32, 38, 42, 43, 49, 53, 61, 62, and 64
In his first argument, the defendant claims the trial court erred in granting the State's challenges for cause as to four venirepersons based on their attitudes regarding the death penalty.[3] Specifically, the defendant claims Lemar Proctor, Theresa Stewart, Susan McAdams and Francis Lewis, were erroneously excluded for cause.

Lemar Proctor
The defendant complains that the trial court erred when it excluded Lemar Proctor for cause because of his attitudes regarding the death penalty. However, trial counsel submitted to the challenge without argument. Because the defendant failed to object contemporaneously to the challenge, we decline to address this assignment of error. La. Code Crim.P. art. 841; State v. Taylor, 93-2201, p. 7 (La.), 669 So.2d 364, 369, cert denied, ___ U.S. ___, 117 S.Ct. 162, 136 L.Ed.2d 106 (1996).

Theresa Stewart
The defendant complains about the court's ruling on a cause challenge based on hardship to prospective juror Theresa Stewart. He also contends the hardship exclusion was merely a pretext for an otherwise impermissible challenge for cause based on Ms. Stewart's reservations against imposing the death penalty. However, the record reveals Ms. Stewart testified she had a 13-year-old son who was "at a critical point" in school,[4] and she took him to be tutored three times a week. She further stated her husband could not take him to tutoring because of his work schedule.
*710 The trial court is authorized to excuse a person from jury service either before or after selection to the general venire or jury pool if such service would result in undue hardship or extreme inconvenience. The court is permitted to take this action on its own initiative or on the recommendation of an official or employee designated by the court. See La.Sup.Ct. R. 26; La.Code Crim.P. art. 783(B); State v. Brown, 414 So.2d 726, 728 (La.1982). The trial court is vested with broad discretion in excusing prospective jurors for undue hardship. State v. Ivy, 307 So.2d 587, 590 (La.1975).
In the instant case, the court exercised its discretion and determined, based on Ms. Stewart's answers, it would constitute an undue hardship for her to serve on the jury. As to the defendant's claim the hardship challenge was merely a pretext, he fails to make any showing of fraud or collusion resulting in prejudice. See State v. Sheppard, 350 So.2d 615, 650 (La.1977). Accordingly, the defendant's claim regarding this juror's dismissal lacks merit.

Susan McAdams and Francis Lewis
The United States Supreme Court announced the standard for the exclusion of potential jurors in death penalty cases in Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). However in 1985, because of a "general confusion surrounding the application of Witherspoon," Wainwright v. Witt, 469 U.S. 412, 418, 105 S.Ct. 844, 849, 83 L.Ed.2d 841 (1985), the Court revisited the issue in Wainwright v. Witt. In Witt, the Court began by stating that "recent opinions of this Court demonstrate no ritualistic adherence to a requirement that a prospective juror make it `unmistakably clear ... that [she] would automatically vote against the imposition of capital punishment.'" Id. at 419, 105 S.Ct. at 849 (emphasis supplied). The court also recognized, as it had previously done in Adams v. Texas, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980), that the State has a "legitimate interest in obtaining jurors who could follow their instructions and obey their oaths." Id. at 44, 100 S.Ct. at 2526. Therefore, "[t]he state may insist... that jurors will consider and decide the facts impartially and conscientiously apply the law as charged by the court." Id. at 45, 100 S.Ct. at 2526. The Witt Court then explicitly recognized that it had previously placed the lower courts in a very difficult position.
The state of this case law leaves the trial courts with the difficult task of distinguishing between prospective jurors whose opposition to capital punishment will not allow them to apply the law or view the facts impartially and jurors who, though opposed to capital punishment, will nevertheless conscientiously apply the law to the facts adduced at trial.
Id., at 421, 105 S.Ct. at 850. Therefore, the Court took the opportunity to clarify the Witherspoon decision.
[T]he proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment ... is whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath."
(quoting from Adams) Id. at 424, 105 S.Ct. at 852. Significantly, the Court explicitly noted that "this standard does not have to be proved with `unmistakable clarity.'" Id., 105 S.Ct. at 852.
This is because determinations of juror bias cannot be reduced to question-andanswer sessions which obtain results in the manner of a catechism. What common sense should have realized experience has proved: many venireman simply cannot be asked enough questions to reach the point where their bias has been made "unmistakably clear".... Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law ... [T]his is why deference must be paid to the trial judge who sees and hears the juror.
Id. at 424, 105 S.Ct. at 852.
The defendant claims the trial court erroneously excluded for cause potential jurors Susan McAdams and Francis Lewis, who, as *711 required by law, indicated a willingness to consider the defendant's age as a mitigating circumstance. The language of La.Code Crim.P. art. 798(2)(b) clearly conforms with the Witt standard. The article in pertinent part reads: "It is good cause for challenge on the part of the state ... [t]hat his (the potential juror's) attitude toward the death penalty would prevent or substantially impair him from making an impartial decision as a juror in accordance with his instructions and his oath." Furthermore, La.Code Crim.P. art. 797, sections (2) and (4) state that either the "state or the defendant may challenge a juror for cause on the ground that: [t]he juror is not impartial, whatever the cause of his partiality ... (or) [t]he juror will not accept the law as given to him by the court." This court has further held that a trial judge is vested with broad discretion in ruling on challenges for cause, and his ruling will be reversed only when a review of the entire voir dire reveals the judge abused his discretion. State v. Robertson, 92-2660, (La.1/14/94), 630 So.2d 1278, 1281.
In Robertson, a potential juror was not excused for cause even though he stated he would not consider mitigating circumstances if the crime involved the killing of more than one person. In that case, we found the juror should have been dismissed for cause because he was unable to accept the law as given, and he was not impartial to the sentence to be imposed. The instant case is the first time this court has had to consider the converse of the Robertson situation, i.e., where a juror has indicated they may give too much consideration to a mitigating circumstance. However, a survey of our sister states reveal they have dealt with this issue.
In Henyard v. State, 689 So.2d 239, 246 (Fla.1996), cert. denied, ___ U.S. ___, 118 S.Ct. 130, 139 L.Ed.2d 80 (1997), the Florida Supreme Court held that a prospective juror was properly dismissed because he expressly stated that he could not follow the law and could not recommend a death sentence for the defendant because of his young age. The defendant was eighteen when he committed crime. In State v. Richardson, 923 S.W.2d 301, 309 (Mo.) (en banc), cert. denied, ___ U.S. ___, 117 S.Ct. 403, 136 L.Ed.2d 317 (1996), an en banc panel of the Missouri Supreme Court held that a potential juror was properly dismissed, despite the fact his reservations about returning the death penalty were based on statutory mitigating factors, when the juror indicated an inability to consider the death penalty based on accomplice liability and the defendant's age. In Garcia v. State, 919 S.W.2d 370, 389 (Tex.Crim.App.1994), the Texas Court of Criminal Appeals found that a potential juror was properly excused when he indicated he could not impose a death sentence upon a youthful offender. The defendant was eighteen years old when the offense was committed. In People v. Fudge, 7 Cal.4th 1075, 31 Cal.Rptr.2d 321, 875 P.2d 36, 45 (1994)(en banc), cert. denied, 514 U.S. 1021, 115 S.Ct. 1367, 131 L.Ed.2d 223 (1995), an en banc panel of the California Supreme Court found that a potential juror was properly dismissed where she stated she could not impose the death penalty due to the defendant's age. The defendant was eighteen years old when he committed the crime and twenty years old at trial. In People v. Kirkpatrick, 7 Cal.4th 988, 30 Cal.Rptr.2d 818, 874 P.2d 248, 257 (Cal.1994)(en banc), cert. denied, 514 U.S. 1015, 115 S.Ct. 1357, 131 L.Ed.2d 215 (1995) again, an en banc panel of the California Supreme Court addressed a similar issue and stated: "A prospective juror who would invariably vote either for or against the death penalty because of one or more circumstances likely to be present in the case being tried, without regard to the strength of the aggravating circumstances likely to be present in the case being tried, is therefore subject to challenge for cause." In People v. Davis, 794 P.2d 159, 206 (Colo.1990), cert. denied, 498 U.S. 1018, 111 S.Ct. 662, 112 L.Ed.2d 656 (1991), the Colorado Supreme Court found that a potential juror was properly excused when he stated he did not think he could return a death verdict in a case where intoxication, a statutory mitigating defense, could be an issue. In State v. Sparks, 147 Ariz. 51, 54, 708 P.2d 732, 735 (1985), the Arizona Supreme Court found that a potential juror was properly dismissed when her responses as a whole indicated her inability to sit on a jury without distraction because she could be sidetracked *712 by reservations about the death penalty and the defendant's youth. In State v. Martin, 41 Wash.App. 133, 138-40, 703 P.2d 309, 312 (1985), the Washington Court of Appeal found that a potential juror was properly dismissed from the jury when he repeatedly stated he could not impose the death penalty on a defendant so young because he had children the defendant's age. In Cannaday v. State, 455 So.2d 713, 718 (Miss.1984), cert. denied, 469 U.S. 1221, 105 S.Ct. 1209, 84 L.Ed.2d 351, cert. denied, 469 U.S. 1229, 105 S.Ct. 1229, 84 L.Ed.2d 366 (1985), the Mississippi Supreme Court found that two potential jurors were properly dismissed when they both indicated they could not vote for the death penalty regardless of the evidence because of the defendant's age. Finally, in Magill v. Florida, 386 So.2d 1188, 1189 (Fla. 1980), cert. denied, 450 U.S. 927, 101 S.Ct. 1384, 67 L.Ed.2d 359 (1981), the Florida Supreme Court found that a potential juror was properly dismissed when it became apparent she could not vote for the death penalty because the defendant was under twenty-one. We, like our sister states who have addressed the issue, hold that when a potential juror indicates his or her attitude regarding the mitigating circumstances would substantially impair his or her ability to return the death penalty, then that juror is properly excludable for cause.
The record of the voir dire reveals that Ms. McAdams initially expressed reservations about the death penalty and indicated she was a theoretical supporter of the death penalty but could not necessarily vote for the death penalty as a member of a jury. In response to the district attorney's query about her ability to return a sentence of death, she responded, "I think in some circumstances I could. In some circumstances I could vote for a death penalty. And in some I maybe couldn't." The State then asked her whether she could return the death penalty in a case which involved an intentional killing occurring during the perpetration of an attempted armed robbery. To that question, Ms. McAdams ultimately responded that she "might" be able to return a death verdict. The State responded to her, noting that she was "shaking [her] head" and that she appeared to be "having a struggle with this," to which Ms. McAdams responded affirmatively. Later, in response to questions from the State, Ms. McAdams expressed considerably stronger reservations about her ability to return a death verdict.
The relevant voir dire demonstrating those reservations reads:
Q: Let's trylet me start this over. You do have some reservations against the death penalty?
A: I have some reservations.
Q: You do have reservations. That's okay. Could those reservations impair your ability to return a death verdict? Could they?
A: I think they could. I mean, I've never had to
Q: The reason I put onthat record doesn't show the struggle that you're having with this. But am I fair that you are having a struggle with this?
A: Yes. Yes.
Q: You cannot clearly and succinctly tell me that your reservations would not have an affect [sic] on whether or not you can return a death penalty in this case; isn't that correct?
A: Yeah. I think you could do all your proving that this had been done by that particular person and I would feel that maybe it would be an appropriate thing, and I would have a very hard time saying it was.
Q: And for reasons extraneous to that, because of your reservations against the death penalty?
A: Yes. Yes.
Q: That's what I'm getting at. What I'm talking about here is personal feelings extraneous to the evidence or reservations against the death penalty that would keep you from returning it.
A: Yes.
Q: So you do have those; is that correct?
A: Yes.
The defense attempted to rehabilitate Ms. McAdams, asking her whether, in spite of her reservations, there were some circumstances under which she could possibly vote *713 for the death penalty to which she responded affirmatively. She also indicated that she would consider mitigating factors during the penalty phase and that although it would "bother" her to return a death verdict against an 18-year-old defendant, she would consider all the evidence.
The trial court excluded Ms. McAdams, first stating that its notes did not reflect that she stated she could return a death verdict in some circumstances. However, the court concluded "whether she said it or not, her final statement in that regard was that her feelings would substantially impair her ability to return a sentencing recommendation with the death penalty." The trial judge went on to state that "it was obvious from... viewing the juror and what she went through in responding to those questions, that it is a troubling issue for her." Accordingly, he concluded that her answers taken as a whole warranted her exclusion.
Ms. Lewis originally expressed little hesitation about her ability to return a death verdict. The record reveals that when the State first asked her if she could return a death penalty verdict, she responded, "It's possible I could, if they proved everything, and proved him guilty. Yeah." In response to the district attorney's question about reservations against the death penalty, Ms. Lewis answered, "Not really. I mean, if the person deserved it andI guess if they deserved it and they deserved the death penalty, that's what they should get." Again, the district attorney observed that she appeared to be struggling with her answers and she responded, "Yeah. A little bit. Because I guess I might have a little problem with it, but I just really don't know." The district attorney then referred to the defendant's age and it's possible effect on the verdict in the penalty phase. Lewis responded, "... if they're young, to me, I think they should get life, not the death penalty." When pressed on her ability to return a death verdict to a defendant 18 years of age at the time of the offense, she responded, "I might have a difficult time with it. I probably will."
Defense counsel attempted to rehabilitate Ms. Lewis asking her if she had "any real reservations against the death penalty." She responded, "I really don't have nothing against it if the person is found guilty on it." Finally, she told defense counsel that she could "look at all the evidence ... and if it comes to the death penalty, yeah. If that's what they deserve." Defense counsel did not ask any question to clarify Ms. Lewis' statement to the district attorney that, "if they're young, to me, I think they should get life, not the death penalty." Again, the court granted the State's cause challenge focusing particularly on the difficulty Lewis expressed about returning a death verdict against a "young" defendant and ultimately concluding that she was excludable under Witt.
As this court recognized in State v. Bourque, 622 So.2d 198, 227 (La.1993), rev'd on other grounds by, State v. Comeaux, 93-2729 (La.7/1/97), 699 So.2d 16, when determining whether or not a juror should be dismissed for cause, the trial judge should consider the potential juror's answers as a whole and not merely consider "correct" answers in isolation. We also note, as did the Court in Witt, that the written transcript cannot convey the full impact of the voir dire experience; thus we often defer to the trial court's discretion.
Upon a review of the entire voir dire process, paying particular attention to the discussion of the State's challenge as to both Ms. McAdams and Ms. Lewis, it is absolutely clear Ms. McAdams and Ms. Lewis, if chosen for service, could not have returned a death verdict because of the defendant's age. Ms. McAdams admitted to having reservations which would impair her ability to return the death penalty and, like Ms. Lewis, admitted to be struggling with the issue. Furthermore, Ms. Lewis clearly stated that if the defendant is young, they should not be given a death sentence.
Although both Ms. McAdams and Ms. Lewis were theoretical supporters of the death penalty, a full reading of the voir dire clearly indicates they could not have imposed the penalty in this case. This is clearly not a case of a juror being dismissed because of a mere willingness to consider age as an appropriate mitigating circumstance, as asserted by the defendant. In the case of these two *714 potential jurors, age would have been the controlling factor in their determination of whether the death sentence should have been imposed. As in Robertson, we find it is clear Ms. McAdams and Ms. Lewis could not accept the law as given and were not impartial to the sentence to be possibly imposed.
Furthermore, it is obvious the trial judge was an active, rather than a passive, participant in the voir dire process. The record clearly indicates the trial judge was actively listening and making note of the demeanor and the responses elicited from all of the potential jurors and actively participating in the discussions concerning the challenges for cause. Specifically, during the discussion of the challenge of Ms. McAdams, the trial judge, as noted earlier, frankly admitted he had not made note of the fact that Ms. McAdams had responded affirmatively that under some circumstances she could vote for the death penalty. However, the trial judge was obviously left with the definite impression that Ms. McAdams could not return a death verdict in this case. The trial judge stated that he did not base his ruling exclusively on one "correct" or "incorrect" answer, but rather based his decision on his perceptions of the voir dire as a whole. In the case of Ms. McAdams, it is clear we should defer to the trial judge's discretion because he was clearly an active participant in the voir dire. He, like the attorneys, was actively working toward seating an impartial jury.
Likewise, the trial judge demonstrated his active participation during the voir dire of Ms. Lewis. For example, as the discussion of the challenge for cause to Ms. Lewis began, the trial judge stopped the attorneys to ensure he was clear as to which juror they were talking about. The trial judge then proceeded to describe what Ms. Lewis wearing and was able to point out which seat she was sitting in during voir dire. Furthermore, during the discussion of the challenge, the trial judge stated Ms. Lewis said she could not return a death verdict against a nineteen-year-old.[5] Based on the entire voir dire and given the trial judge's obvious active participation in the voir dire, we cannot say the trial judge abused his discretion in sustaining the State's challenge for cause. For these reasons, we find, based on the entire voir dire, the trial court did not err in dismissing Ms. McAdams and Ms. Lewis for cause.

Assignment of Error Numbers 18, 28, 34, 37, 40, 56, 59, 70, 77, 79, 81, 82, 85, 86, 87, 88, 89, 90, 91, 92, 101, 104, 105, 106, 107, 108, 109, 110, 111 114 and 115.
In his second argument, the defendant alleges the State acted in bad faith when it presented and argued evidence during the guilt phase to prove the aggravating circumstance that the offense was committed in an especially heinous, atrocious or cruel manner and then withdrew that aggravating circumstance from the jury's consideration after the close of evidence in the penalty phase. Additionally, the defendant claims the State made several improper arguments during both the guilt and penalty phases of the trial.

Withdrawal of Statutory Aggravating Circumstance
After the close of evidence in the penalty phase, prior to closing arguments, and without objection, the district attorney withdrew from the jury's consideration the aggravating circumstance that the offense was committed in an especially heinous, atrocious or cruel manner. The defendant argues the district attorney acted in bad faith by initially stating an intention to rely on this aggravating circumstance, arguing extensively about Lawless's death during the guilt phase, and then withdrawing the aggravating circumstance in the penalty phase. However, when the district attorney withdrew this circumstance, the defendant did not object or move for a mistrial. In fact, defense counsel offered to stop the court if it stumbled and accidentally gave the charge when instructing the jury. Nevertheless, this court's scope of review in capital cases extends to alleged errors occurring during the sentencing phase, whether objected to or not. State v. Taylor, 93-2201, p. 7 (La.2/28/96), 669 So.2d 364, 369, cert. denied, ___ U.S. ___, 117 S.Ct. 162, 136 L.Ed.2d 106 (1996).
*715 Assuming, arguendo, that the State acted in bad faith, it does not appear that defendant suffered any prejudice. Evidence of the victim's suffering before death would have been admissible in any event. While it may not have constituted a statutory aggravating circumstance, the reality of how the victim died constituted a circumstance of the crime for the jury to consider in assessing the moral culpability of the defendant's act. La.C.Cr.P. art. 905.2(A) ("The sentencing hearing shall focus on the circumstances of the offense and the character and propensities of the offender.") Consequently, whatever the prosecutor's motivation, the presentation of evidence regarding the immediate circumstances of the victim's death and any argument regarding that evidence at the close of the penalty phase did not prejudice the defendant.[6]

Improper Argument: Guilt Phase
The defendant also complains that the State's reference to the victim as a "good man, a nice man" during the guilt phase unfairly prejudiced the jurors to return a death verdict. However, the defendant failed to object contemporaneously to the reference and thus waived any claim based on it. La.Code Crim.P. art. 841; Taylor, 93-2201 at p. 7, 669 So.2d at 369. Similarly defendant's complaints about an alleged reference to his failure to testify[7] and the State's comment that "young guns can kill you as quick as old guns" during its closing argument were waived by defendant's failure to object at trial. Id.

Improper Argument: Penalty Phase
The defendant also claims the district attorney made several inappropriate arguments during his closing argument at the penalty phase. First, the defendant states the district attorney impermissibly interjected his personal opinion about the defendant's credibility after the defendant testified during the penalty phase regarding his encounter with Earl Maples. Specifically, the defendant claimed Maples had made unwanted homosexual advances after he agreed to give the defendant a ride in his truck. The prosecutor told the jury, "[Defendant's] claiming some homosexual activity. But you did notice, and I don't believe that, I don't think that you should, based on the evidence, because he just showed you that he's a liar, and he'll lie under the circumstances." While a prosecutor may not give his personal opinion regarding the veracity of a witness, it is permissible for him to draw inferences about a witness's truthfulness from matters on the record. La.C.Cr.P. art. 774. Here, the only evidence presented suggesting Mr. Maples picked up the defendant hoping to engage in sexual activity was the defendant's own testimony during the penalty phase. Therefore, the district attorney's comments appear to be a fair comment on the evidence.
Next, the defendant complains about the State's comments that the defendant's "apologies means nothing [and h]is remorse means nothing." However the argument also appears to have been a fair comment upon the evidence, especially when considered in light of the fact that the defendant originally denied all involvement in the crime. In any event, the comment acknowledged that the defendant had, in fact, expressed remorse during his confession. Though a lack of remorse is a relevant factor for the sentencing jury's consideration, see State v. Summit, 454 So.2d 1100, 1108 (La. 1984), cert. denied, 470 U.S. 1038, 105 S.Ct. *716 1411, 84 L.Ed.2d 800 (1985), the district attorney's comment did not unfairly prejudice the defendant.
The defendant also alleges the State improperly suggested to the jury that the standard to determine mitigation because of a mental condition was the defendant's ability to distinguish right from wrong. The prosecutor argued the defendant "don't [sic] have any [other] mental conditions or problems that millions of people in a country with two hundred and fifty-one million people have." However, the defendant is merely speculating about what inferences the jury drew from the prosecutor's statements and failed to establish the jury did not take these statements at face value. As they appear, the prosecutor was not misstating the jury's duty in the penalty phase.
Next, the defendant argues the district attorney should not have referred to facts and circumstances in his own life and compared himself to defendant who offered as mitigation evidence testimony demonstrating that he used to care for his deaf mute mother. The record shows that prosecutor told the jury:
My own mother was handicapped. Got one of the first handicapped tags in the state of Louisiana. I lived with her and took care of her till she died. But having a nice mother, having a mother with an affliction, doesn't give you the right to cause the pain, misery, and suffering that he showed you that he has embarked on since he was thirteen years old.
Finally, the defendant complains the State argued improperly that the jury should send a message to society by returning a death verdict in this case when the district attorney stated:
... you live in a state with a death penalty, and you say that you believed in it, and you say it's an appropriate penalty for first degree murder, then I say this is the case, this is the day where you give your answer to this. You say, no. You say I am not going to tolerate it. I am not going to find it mitigating. I am not going to excuse it. I am not going to do anything but give you a message, do not do this. We're not impotent. We're not helpless in a society. We do have it....
He says to show you that family. Look at this family. What's the justice to them? That's not vindictiveness, that's justice.
... This family will wait on your verdict. I will wait on your verdict.
Prosecutors may not resort to personal experience or turn argument into a plebiscite on crime. State v. Eaton, 524 So.2d 1194, 1208 (1988), cert. denied, 488 U.S. 1019, 109 S.Ct. 818, 102 L.Ed.2d 807 (1989); State v. Barrow, 410 So.2d 1070, 1075 (La.), cert. denied, 459 U.S. 852, 103 S.Ct. 115, 74 L.Ed.2d 101 (1982); State v. Prestridge, 399 So.2d 564 (La.1981). However, before this court will reverse on the basis of improper argument it must be thoroughly convinced the jury was influenced by the remarks and such contributed to the verdict. Eaton, supra. "In making this determination, the court gives credit to the good sense and fairmindedness of the jury." Eaton, 524 So.2d at 1208. See also Taylor, 93-2201 at p. 21, 669 So.2d at 375
Upon a review of the record and considering the "good sensibility and fairmindedness of juries," it does not appear that the district attorney's comments necessarily contributed to the death verdict. The district attorney's brief reference to his own mother, while perhaps inappropriate, clearly did not contribute to the verdict. Additionally, the district attorney's comments did not degenerate into a plebiscite on crime. Accordingly, the defendant's claims about the State's comments are without merit.

Assignment of Error Numbers 12, 14, 27, 36, 39, 45, 58, 69, 72, 74, 94 and 95
In his third argument, the defendant claims the court read an erroneous instruction on reasonable doubt during voir dire[8] and again before deliberation.[9] The defendant *717 alleges there is a reasonable likelihood the jury interpreted the trial court's definition of reasonable doubt in an unconstitutional manner, and the charge given violated the defendant's right to due process and to a jury trial.
The defendant complains most vociferously about the portion of the charge in which the court contrasts a reasonable doubt with a "mere slight misgiving." In the defendant's view, Victor v. Nebraska, 511 U.S. 1, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994), tolerates the use of the phrase "substantial doubt" only in the context of an instruction which otherwise demonstrates by the use of other terms such as "fanciful conjecture" that the word substantial refers to the existence rather than the magnitude of doubt.[10] The defendant thus argues that the court's choice to contrast a substantial doubt with a "misgiving" as opposed to "a doubt arising from mere possibility, from bare imagination, or from fanciful conjecture" allowed the jurors to vote to convict him despite possessing a higher degree of doubt than is Constitutionally required for acquittal.
The defendant's argument is not convincing. Importantly, although the trial judge did not follow the reasonable doubt charge proposed in the Louisiana Judges' Criminal Bench Book,[11] he nonetheless modified the noun misgiving with the adjectives "mere" and "slight." In these circumstances, a mere slight misgiving or possible doubt does not appear significantly distinguishable from a doubt arising from a mere possibility, bare imagination or fanciful conjecture. Moreover, the court's charge did not equate substantial doubt with grave uncertainty as did the unconstitutional instruction read in Cage v. Louisiana, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990).[12]See Victor, 511 U.S. at 5, 114 S.Ct. at 1243.
*718 The defendant also complains about the portion of the definition which equated a reasonable doubt with a doubt for which the jurors could give a good reason. However, in State v. Smith, 91-0749 (La.5/23/94), 637 So.2d 398, cert. denied, 513 U.S. 1045, 115 S.Ct. 641, 130 L.Ed.2d 546 (1994), this court found that an instruction equating a reasonable doubt with "a serious doubt for which you could give a good reason" was not constitutionally infirm. Id. at p. 2, 637 So.2d at 399. Consequently, this claim does not warrant relief.

Assignment of Error Numbers 29 and 97
In his fourth argument, the defendant claims the trial court erred during the penalty phase when it admitted evidence of other crimes which were held inadmissable during the guilt phase by this court. Furthermore, the defendant claims he received insufficient notice of the State's intent to use evidence of a third set of armed robberies committed by the defendant and the State's presentation of that evidence went impermissibly beyond that allowed by this court.

Prieur Evidence
The record reveals the State originally intended to introduce evidence of two sets of prior armed robberies during the guilt phase. These incidents included the Maples robbery and two armed robberies which took place at Cortana Mall in Baton Rouge in early 1993. After holding a Prieur hearing, the trial court held the other crimes admissible in order to show modus operandi, system and intent. The defendant sought writs in this court. This court excluded only the evidence of the Cortana robberies in the instant case because that evidence would have had little probative value as to the defendant's intent to kill or inflict great bodily harm. State v. Williams, 95-1064 (La.5/1/95), 654 So.2d 1087. The defendant alleges this court's order, excluding evidence of his participation in the robberies occurring at Cortana Mall, applied not only to the guilt phase of the trial but also to the penalty phase.
"While the character of the defendant is usually irrelevant to the determination of guilt, it is one of the factors on which the determination of sentence is focused." State v. Hamilton, 478 So.2d 123, 129 (La. 1985), cert. denied, 478 U.S. 1022, 106 S.Ct. 3339, 92 L.Ed.2d 743 (1986). "The sentencing hearing shall focus on the circumstances of the offense, the character and propensities of the offender, and the impact that the death of the victim has had on the family members." La.Code Crim.P. art. 905.2(A) (emphasis added). Therefore, even though the Cortana robberies may have been irrelevant in the guilt phase, these prior bad acts as well as the Maples incident were all relevant to the defendant's character, the primary focus of the penalty phase. Thus, the defendant's claim is without merit.

Insufficient Notice
Alternatively, the defendant claims the State offered insufficient notice of its intent to use evidence of the Cortana robberies during the penalty phase. In Hamilton, this court vacated the defendant's death verdict when it found the State introduced "entirely new evidence of another [unadjudicated] crime ... without any notice whatsoever to defendant to be prepared to meet such evidence." Hamilton 478 So.2d at 131. The Hamilton court concluded that the notice provision of La.Code Crim.P. art. 720[13] should apply also to the penalty phase in a bifurcated capital case. Id. at 132.
In the instant case, the defendant's claim of insufficient notice is not convincing. First, unlike the defendant in Hamilton, the defendant had already been convicted of the crimes which occurred at Cortana Mall. In addition, despite his protests to the contrary, the defendant had notice as a result of the Prieur hearing, which occurred months before trial, of the State's intent to present the evidence of the Cortana robberies during the guilt phase of the trial and thus should have been prepared to cross-examine witnesses and present evidence about the crimes. *719 Though this court ultimately ordered the evidence excluded on the eve of trial, the defendant was prepared for its introduction. In fact, in his brief to this court, the defendant admitted to having notice of the proposed introduction of the Cortana robberies at the guilt phase. Nonetheless, he maintains he was unprepared to contest the evidence at the penalty phase. This argument appears especially tenuous in light of the fact that evidence admissible during the guilt phase is necessarily admissible during the penalty phase. La.Code Crim.P. art. 905.2(A) ("The jury may consider any evidence offered at the trial on the issue of guilt."). Furthermore, once the State learned the evidence would be excluded in the guilt phase, it immediately provided the defendant and the court with oral and written notice that it intended to introduce the evidence at the penalty phase. Finally, the defendant's own psychologist, Dr. Turin, testified about the Cortana robberies during the penalty phase while giving a narration of defendant's life.
In State v. Ward, 483 So.2d 578 (La.), cert. denied, 479 U.S. 871, 107 S.Ct. 244, 93 L.Ed.2d 168 (1986), this court found a State response to a defense discovery request revealing the State would rely on "defendant's prior criminal record," without more, constituted sufficient notice of the State's intention to introduce prior crimes evidence at the penalty phase. The court went on to point out that:
the notice required in the penalty phase is not as detailed as that required by C.Cr.P. 720 in the guilt phase and State v. Prieur, 277 So.2d 126 (La.1973), because in the penalty phase there has already been a determination of guilt lessening the chance that the defendant will be tried for crimes other than those charged.
Ward, 483 So.2d at 588. In the instant case, once the State learned this evidence was to be excluded during the guilt phase, it gave both oral and written notice that it intended to use these particular convictions during the penalty phase. Accordingly, the defendant's claim about a lack of notice is without merit.

Jackson Violation
Finally, the defendant claims the State went beyond the necessary presentation to prove the earlier robberies and thereby introduced an arbitrary factor into the sentencing phase of the trial. The defendant was originally charged with armed robbery in connection with the Cortana Mall incident, but eventually pled guilty to two counts of simple robbery. As an initial matter, the record reveals that when presenting evidence of the Cortana Mall robberies, the district attorney adhered to the rule of State v. Jackson, 608 So.2d 949 (La.1992), which "specifically prohibit[s] evidence of the original charge when the conviction is for a lesser offense." Id. at 954. However, Jackson also "limit[s] the evidence supporting the conviction ... to the testimony of the victim[s] or of any eyewitness to the crime." Id. In the instant case, the State presented not only the testimony of both victims of the Cortana robberies but also the testimony of the officer who responded to the call, chased the defendant, apprehended him, and returned him to the victims for identification. Consequently, it appears that the State technically violated the rule set out in Jackson.
In Jackson, this court explicitly recognized that evidence of a defendant's past convictions of serious and unrelated crimes was "extremely probative of and relevant to the character and propensities of the defendant." Id. However, Jackson is a jurisprudential rule created to prevent the injection of arbitrary factors into sentencing. Upon a review of the record, it is apparent the police officer's testimony did not inject an arbitrary factor into the jury's deliberations.[14] In fact, *720 even though the defendant was originally charged with armed robbery, both victims' testimony was strictly limited to the robbery, and there was no mention or implication the defendant effectuated the robbery with a gun. Furthermore, the testimony of the victims' and the officer who apprehended the defendant comprises less than six pages of the record. Accordingly, the introduction of the police officer's testimony, although an error, does not rise to the level of reversible error.

Assignment of Error Number 99
In his fifth argument, the defendant claims the introduction of certain victim impact evidence introduced an arbitrary factor into the jury's deliberation during the penalty phase. Specifically, he complains the victim's family members testified the defendant's apology did not lessen the impact the victim's death had upon them, and they also testified they did not have sympathy for defendant. The defendant's complaints center around the testimony of Lawless's sister, Rita Daigle, and his father, Arnold Lawless. The defendant also complains he was given insufficient notice of the extent of the victim impact evidence to be presented.

Victim Impact Evidence
In Payne v. Tennessee, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), the United States Supreme Court re-examined its view of victim impact evidence and overruled two of its prior decisions: Booth v. Maryland, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), and South Carolina v. Gathers, 490 U.S. 805, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989).[15] The Payne court recognized that "[v]ictim impact evidence is simply another form or method of informing the sentencing authority about the specific harm caused by the crime in question ... and in the majority of cases ... [it] serves entirely legitimate purposes." Furthermore, "for a jury to assess meaningfully the defendant's moral culpability and blameworthiness, it should have before it at the sentencing phase evidence of the specific harm caused by the defendant." Payne, supra, 501 U.S. at 825, 111 S.Ct. at 2608. The Court concluded "that if a state chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no per se bar." Id. at 827, 111 S.Ct. at 2609 (emphasis supplied). Justice Souter, in concurrence, characterized admissible victim impact evidence as "information revealing the individuality of the victim and the impact of the crime on the victim's survivors." Id. at 835, 111 S.Ct. at 2614 (Souter, J., concurring). This court further characterized the extent of victim impact evidence admissible under Payne and placed it into two categories: (1) information revealing the individuality of the victim; and, (2) information revealing the impact of the crime on the victim's survivors. State v. Taylor, 93-2201, p.10 (La. 2/28/96), 669 So.2d 364, 370; see also, State v. Scales, 93-2003 (La.5/22/95), 655 So.2d 1326, cert. denied, 516 U.S. 1050, 116 S.Ct. 716, 133 L.Ed.2d 670 (1996); State v. Martin, 93-0285 (La.10/17/94), 645 So.2d 190, cert. denied, 515 U.S. 1105, 115 S.Ct. 2252, 132 L.Ed.2d 260 (1995). Thus, some evidence depicting the impact of the loss on the victim's survivors is permitted. However, the evidence may not descend into detailed descriptions of the good qualities of the victim, particularized narrations of the sufferings of the survivors, or what opinions the survivors hold with respect to the crime or the murderer. State v. Bernard, 608 So.2d 966, 972 (La.1992).
*721 The defendant raises two issue regarding the victim impact evidence presented in the penalty phase. First, he alleges the victim's family member's testimony concerning the impact of the defendant's apology was impermissible. However, as noted above, evidence of the impact of the crime on the victim's survivors is clearly admissible under the Payne. The testimony that the defendant's apology did not lessen the impact of their loss clearly addresses how the survivors have been impacted by the death of their family member and does not address their opinions about the crime or the defendant.
The defendant also alleges the family member's testimony that they did not have any sympathy for the defendant was impermissible. In State v. Taylor, this court faced a similar factual pattern wherein the victim's survivors stated they had no sympathy for the defendant. The Taylor court, assuming, but not deciding, such comments exceeded the boundaries set forth in Bernard, found the error was harmless.[16]Taylor, 93-2201 at p. 11, 669 So.2d at 371. In concluding the alleged error was harmless, the court began by noting the questionable testimony was presented on the first day of a five day penalty hearing at which the defendant introduced a great deal of mitigation evidence, including the testimony of 20 witnesses. In contrast, the entire victim impact testimony occupied only 10 pages of the penalty hearing transcript. Therefore, any possible prejudice was diluted by the defendant's presentation. Id. at p. 12, 669 So.2d at 371. The court continued, stating:
surely the jury regarded the testimony of these victim impact witnesses as normal human reactions to the death of a loved one. That the victim's survivors might have little or no sympathy for the defendant certainly would come as no surprise to a member of the jury.
Id. Finally the Taylor court also noted the trial court had given an instruction on the appropriate weight to be afforded the victim impact testimony.
In this case, the penalty phase began and ended on the same day and the defendant presented the testimony of four witnesses and took the stand himself. The defense's witnesses included a former employer, a deaf counselor for whom the defendant had done volunteer work at a deaf camp, a psychologist, and the defendant's mother who spoke through a sign language interpreter. The presentation of testimony on the defendant's behalf totaled nearly seventy-two pages.
In contrast, the State presented testimony from six people. Three of the State's witnesses, the victim's wife, Ruby Lawless; his sister, Rita Daigle; and his father, Arnold Lawless, made victim impact statements. Ms. Daigle and Mr. Lawless made the complained of statements which were quite brief.
Mr. Sinquefield: Let me ask you this, yesterday you were in court when that video tape was played, he apologized to the family, said, I know sorry won't do any good, but I'm sorry. Said he didn't kill a man. Does that apology make his death any easier on you?
Ms. Daigle: Not at all.
Mr. Sinquefield: Does it cause you to have any sympathy for him?
Ms. Daigle: Not at all.
* * * * * *
Mr. Sinquefield: The defendant's apology on that tape, does that carry or make it any easier for you?
Mr. Lawless: No. It doesn't.
Mr. Sinquefield: Does it cause you to have sympathy for him?
Mr. Lawless: No, it doesn't.
Besides their responses to the State's questions about the impact of the defendant's apology and whether they had sympathy for him, the balance of their testimony consisted mainly of a description of the victim and the impact his death had on them in only the most general terms.
As in Taylor, assuming without deciding whether the victim impact statements *722 went beyond the bounds of Bernard, we find any potential error to have been harmless. As this court stated in Taylor, we reiterate that the fact the victim's family did not have any sympathy for the defendant should not have come as a surprise to the members of the jury. In fact, it may be more surprising for a jury to learn that the victim's survivors do have sympathy for the defendant. The above quoted passages represent, in total, the complained of testimony. Even though in the instant case, unlike Taylor, the court gave no instruction on the weight to be accorded victim impact testimony, upon a review of the entire penalty phase,[17] we find that the verdict rendered by the jury was clearly unattributable to these very brief statements made by the victim's family.

Notice
The defendant also alleges he did not receive adequate notice of the use of the victim impact evidence. Specifically, he alleges the notice provided by the State and the subsequent admissibility hearing did not give him notice the State was going to inquire into the effect of the defendant's apology and their sympathies for the defendant. This lack of specific notice resulted in harm to the defendant because he was unable to prepare for and/or address the specifics of the victim impact evidence. We find the defendant's arguments unpersuasive. Victim impact evidence does not go to the proof of an essential element of the crime, therefore the State is required to give the defense notice so it can be prepared for the presentation of such evidence. State v. Bernard, 608 So.2d 966, 972 (La.1992). In the instant case, the defendant did receive notice the State was going to present victim impact evidence and a hearing was conducted on the issue. We find, upon a review of the record, that the defendant received adequate notice of the use of victim impact evidence and any prejudice alleged is merely speculative. Furthermore, the verdict rendered by the jury was clearly not attributable to any potential error.

Assignment of Error Numbers 7, 13, 20, 24, 25, 26, 33, 35, 46, 47, 48, 51, 52, 55, 57, 63, 66, 67, 71, 75, 93, 96, 112, 113, 116, 119, and 120
In his sixth argument, the defendant claims the court's use of the word "recommendation" when referring to the jury's verdict at the trial's penalty phase, impermissibly diminished the jurors' sense of responsibility about returning the death penalty. The defendant cites to numerous occasions when both the court and the district attorney referred to the jury's verdict as a "recommendation." The record reveals the defendant filed a motion in limine requesting the court use the term verdict or decision as opposed to recommendation when referring to the jury's determination during the trial's penalty phase. The trial court denied the motion, stating the term "recommendation" was required by La.Code Crim.P. art. 905.7.
The exchange between the court and the attorneys reveals all were unaware of the 1988 amendments to La.Code Crim.P. arts. 905.3, 905.6 and 905.7. Although prior to the amendment, the code articles equated a capital jury's sentencing decision to a recommendation, see La. Acts 1976, No. 694, § 1; La. Acts 1985, No. 231, § 1, the 1988 amendment rewrote the articles, eliminating references to jurors' sentencing "recommend[ations]" and substituting instead "determin[ations]." See La. Acts 1988, No. 779, § 1, effective July 18, 1988.
As a general principle, the failure to impress upon the jury the seriousness and finality of its decision is a denial of due process and reliable capital sentencing. Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). Most recently, in State v. Bourque, 96-0842 (La.7/1/97), 699 So.2d 1, this court ultimately concluded that the district attorney's use of *723 the term "recommendation" during voir dire did not impermissibly lessen the jury's responsibility. In that case, however, the reference occurred only during voir dire and was made only by the prosecutor, not the trial judge. In contrast, in the instant case, the court referred to the jury's sentence as a recommendation several times in its final instructions during the penalty phase,[18] and the term also appeared on the heading of the verdict form. Therefore, we must consider the "context in which [the references were made] to determine whether the references were such that would induce a juror to disregard his responsibility." Id. at p. 3, 699 So.2d at 5.
Taken as a whole, and considering the State's argument during the penalty phase,[19] it is apparent the jury was fully aware of the finality of its decision. The use of the term "recommendation" did not impermissibly minimize the jurors' sense of the importance of their decision. Furthermore, it is clear the references to a recommendation did not imply the jurors' determination would not be binding. As this court previously announced in State v. Tart, 93-0772, p. 43 (La.2/9/96), 672 So.2d 116, 150, cert. denied, ___ U.S. ___, 117 S.Ct. 310, 136 L.Ed.2d 227 (1996), under the circumstances, "[n]o juror could have failed to appreciate the nature and gravity of the jury's death penalty decision." see also State v. Lindsey, 543 So.2d 886, 903 (La.1989); cert denied 494 U.S. 1074, 110 S.Ct. 1796, 108 L.Ed.2d 798 (1990).

Assignment of Error Numbers 123 and 124
In his seventh argument, the defendant claims the trial judge, in effect, coerced the jury's verdict when he asked jurors if they needed additional time to deliberate without re-instructing them that in the event all were not able to agree on a sentence, the defendant would receive a sentence of life imprisonment at hard labor without benefit of parole, probation or suspension of sentence.
The trial court instructed the jurors about the consequences of their inability to return a unanimous verdict during its instructions following closing arguments during the penalty *724 phase.[20] The minutes reveal that the jury then retired at 6:30 p.m. An hour and fifteen minutes later, the jurors returned to the courtroom so the judge could rule on their requests to: (1) examine Dr. Turin's psychological evaluation of defendant; and (2) receive a definition of mitigation. Without objection from the State or defense, the court denied the jury's request to review the written psychological report and read a dictionary definition of mitigation. At 9:35 p.m., the court summoned the jurors to the courtroom and inquired whether they wished to continue deliberating or recess for the evening. The foreman expressed a desire to continue deliberations and the jury retired again at 9:37 p.m. The jury returned at 9:55 p.m. with a death verdict.
Trial courts are required to inform jurors fully as to the consequences of their penalty recommendations; when discretion is afforded on a matter so grave, that discretion must be suitably directed so as to minimize the risk of arbitrary and capricious action. State v. Williams, 392 So.2d 619, 633 (La. 1980) (on rehearing). See also, State v. Jones, 474 So.2d 919, 936 (1985), cert. denied, 476 U.S. 1178, 106 S.Ct. 2906, 90 L.Ed.2d 992 (1986); State v. Loyd, 459 So.2d 498, 503 (La.1984).
Jones, Loyd and Williams all dealt with instructions to the jury on unanimity of recommending life or death. In Williams, the jury deliberated three hours and reported it was unable to unanimously agree on a sentence recommendation. The trial court (re)instructed jurors that either recommendation, life or death, "must" be unanimous. Some 45 minutes later the jury unanimously voted for death. This court reversed, noting the trial court's failure to inform the jury fully of the consequences of their votes left them "free to speculate as to the outcome," "reasonably may have swayed a juror to join the majority, rather than hold to his honest convictions," and "failed to suitably direct and limit the jury's discretion so as to minimize the risk of arbitrary and capricious action." Id., 392 So.2d at 634.
In State v. Jones, 474 So.2d 919 (La.1985), cert. denied, 476 U.S. 1178, 106 S.Ct. 2906, 90 L.Ed.2d 992 (1986), the defendant requested a pre-deliberation jury instruction regarding the imposition of a life sentence if the jurors could not agree unanimously on a sentence recommendation. The court observed this action on the part of the judge had "no pertinence when the jury retires to deliberate and immediately returns a unanimous recommendation." 474 So.2d at 936. Instead, it only comes into play "when the jury is unable to agree unanimously." Id. The instruction is then needed "to avoid jury confusion and to prevent an arbitrary result." Id. Because the jury in Jones had deliberated a relatively short time before unanimously recommending the death penalty and because there was no suggestion of the possibility of jury confusion, the court refused to vacate the death penalty. Finally, in Jones, the court noted "the prudent course for the trial judge is to give an outset instruction that the jury's failure to agree unanimously will result in an automatic sentence of life imprisonment without benefit." Id., at n. 17.
Despite the defendant's claims to the contrary, the instant case appears more analogous to Jones than Williams. As an initial matter, unlike either earlier case, the trial court actually instructed the jury on the effect of its inability to reach a verdict before it initially retired. Moreover, the jurors did not request any clarification about the court's instruction at any time during its deliberation. In this situation, the court's failure to re-read the instruction did not cause "jury confusion and ... an arbitrary result." Id. at 936. Consequently, this claim lacks merit.

Assignment of Error Numbers 10 and 11
In his eighth argument, the defendant claims the trial court erred during the guilt phase when it allowed under State v. Prieur, 277 So.2d 126, 130 (La.1973), introduction of evidence of the defendant's earlier robbery of Earl Maples. Specifically, the defendant claims the trial court erroneously employed a preponderance standard when admitting the evidence, and the State failed to prove by clear and convincing evidence the *725 defendant in fact committed the earlier crime. This court's denial of pre-trial writs regarding the admissibility of the Maples offense does not bar consideration of the merits on direct appeal. State v. Fontenot, 550 So.2d 179 (La.1989).
As discussed above, the trial court originally ruled that evidence of both the Cortana Mall robberies and the Maples robbery was admissible. The colloquies between the trial court and the attorneys evidenced considerable confusion about the standard of proof required before a court may admit evidence of other crimes.[21]
However, despite the confusion surrounding the standard employed by the court when deeming the evidence admissible, it is clear the State met its burden of proving the defendant committed the Maples robbery by clear and convincing evidence. At the Prieur hearing, the State called Earl Maples who positively identified the defendant as the individual who shot and robbed him. The victim also testified that he did not select the defendant's photograph when officers originally presented him with a photographic lineup because the defendant's family lived near him and he feared repercussions for identifying him. On cross-examination, Maples admitted not identifying the defendant during two lineups but again maintained that he actually recognized the defendant but was scared to identify him to the police. The State then called Officer James Dietrich who testified that three latent prints were lifted from Maples' truck, all of which matched the defendant's. Dietrich also testified that during his interview with Travis Hampton, Hampton told him the defendant admitted shooting Maples. Consequently, it is clear the State proved by clear and convincing evidence the defendant committed the armed robbery and shot of Maples.
In any event, evidence of other crimes, wrongs, or acts committed by the defendant is generally inadmissible because of the "substantial risk of grave prejudice to the defendant." State v. Prieur, 277 So.2d 126, 128 (La.1973). Under La.C.E. art. 404(B)(1), however, such evidence may be admitted for the purpose of showing, "motive, opportunity, intent, preparation, plan, knowledge." This court has also held other crimes evidence admissible as proof of other crimes exhibiting almost identical modus operandi or system, committed in close proximity in time and place. State v. Ballard, 351 So.2d 484 (La. 1977). Evidence of other bad acts, however, is not admissible simply to prove the bad character of the accused. La.C.E. art. 404(B)(1). Furthermore, the other crimes evidence must tend to prove a material fact genuinely at issue, and the probative value of the extraneous crimes evidence must outweigh its prejudicial effect. Id. at 487.
Despite the State's claim to the contrary, evidence of the Maples incident should not have been admitted to show system or modus operandi because the defendant confessed to being the individual who shot the victim and thus his identity was not at issue. Cf. State v. Ester, 436 So.2d 543, 546 (La.1983) ("the system exception applies if identity of defendant as the perpetrator is a crucial issue"). Nonetheless, because the defendant claimed the gun went off accidentally, evidence of the shooting earlier that day was relevant to show he in fact intended to fire the gun at the victim, from which the jury could have inferred he possessed the specific intent to *726 kill or inflict great bodily injury. See State v. Jackson, 625 So.2d 146, 150 (La.1993) ("[when] the element of intent is regarded as an essential ingredient of the crime charged, it is proper to admit proof of similar but disconnected crimes to show the intent with which the act was committed."); cf. State v. Sullivan, 596 So.2d 177, 190 (La.1992), rev'd on other grounds, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993) (pointing a gun and firing it supports inference of specific intent to kill). As a result, the defendant's claim about admission of the Maples robbery lacks merit.

Assignment of Error Numbers 50 and 54
In his ninth argument, the defendant claims the State impermissibly exercised its peremptory challenges to exclude potential jurors Brunetta Brown, Mary Thomas and Eve Amar based exclusively on their race, and that under Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), he is therefore entitled to a new trial.
Under Batson, a defendant must first establish a prima facie case of discrimination by showing facts and relevant circumstances which raise an inference the prosecutor used his peremptory challenges to exclude potential jurors on account of race. The burden of production then shifts to the State to come forward with a raceneutral explanation, and if the race-neutral explanation is tendered, the trial court then must decide, in step three, whether the defendant had proven purposeful racial discrimination. Purkett v. Elem, 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995) (Per Curiam) (citations omitted); see State v. Collier, 553 So.2d 815 (La.1989). The second step need not demand an explanation that is persuasive, or even plausible, and unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race-neutral. Purkett, 514 U.S. at 767, 115 S.Ct. at 1771. The ultimate burden of persuasion remains on the defendant to prove purposeful discrimination. Id.; see Batson, supra; Hernandez v. New York, 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991). A trial judge's determination pertaining to purposeful discrimination rests largely on credibility evaluations, so his findings are entitled to great deference by the reviewing court. Batson, 476 U.S. at 98, n. 21, 106 S.Ct. at 1724, n. 21.
The record of the voir dire reveals that Brunetta Brown testified she believed in the death penalty, and the defendant's age would not affect her ability to return a death verdict. When examined by the defense, Brown stated she was employed as an assistant manager at a group home for the mentally retarded. Later, she indicated to the court she had heard about the crime on the television news but did not recall any details about it. Nonetheless, she informed the court she had the ability to put aside anything she heard about the crime and base her verdict on the evidence. The State asserted it challenged Brown based on her employment with the mentally retarded and the belief it might affect her ability to return a death verdict against a defendant in the borderline range for mental retardation, mitigating evidence the defense had originally intended to offer during the penalty phase.
The district attorney noted that Mary Thomas "hesitated a little bit" when asked if the death penalty was appropriate for first degree murder. Later, the prosecutor asked her whether she felt the death penalty should be imposed in cases in which the victim was intentionally killed during an armed robbery and she responded, "Oh yes." When questioned by the defense, Thomas indicated she would be able "stick to" a verdict of life imprisonment if she believed the evidence did not warrant the death penalty, even in the event the other jurors wished to return a death verdict. When asked for a race-neutral reason for Thomas's exclusion from the jury, the district attorney stated he observed nervousness on her part, specifically finding her "weak, scary and shaky on the death penalty." The prosecutor also told the court he exercised a peremptory challenge to a white juror on the same panel for the identical reason.
Eve Amar informed the State that she was a criminal justice student at Southwestern Louisiana University and had ambitions of becoming a state trooper. She also claimed she had been a victim of date rape. She *727 stated she believed in the death penalty in certain circumstances[22] and had debated in favor of it in class. Finally, she told the State she could personally return the death penalty and the defendant's age would have no affect on her verdict. The State first challenged Amar for cause, claiming her answer in which she stated she only thought the death penalty was appropriate in certain circumstances showed she was excludable under Witt. The court denied the challenge, stating Amar indicated she could return a death verdict in certain circumstances and thus her answers did not warrant a cause challenge. The State objected to the court's ruling. Later, in response to defendant's Batson challenge to the exclusion of Amar, the district attorney stated that he exercised the peremptory challenge based on her statement she did not think the death penalty was appropriate in cases in which the death was accidental, noting in the instant case, the defendant claimed the gun went off accidentally and thus Amar's response "scare[d him] to death."
The court entertained the State's race-neutral reasons for the exclusions without making a finding as to whether defendant had made a prima facia showing of purposeful racial discrimination. In this situation, the issue of whether the defense established a prima facie case of discrimination is moot. See State v. Green, 94-0887, p. 25 (La.5/22/95), 655 So.2d 272, 288 (applying Hernandez v. New York, 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991), and concluding once the trial judge has demanded race-neutral reasons for his peremptory strikes from the prosecutor, the issue of a prima facia case of discrimination becomes moot). Nonetheless, any response will qualify as race-neutral "unless a discriminatory intent is inherent in the prosecutor's explanation." Hernandez v. New York, 500 U.S. 352, 360, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991).
In the instant case, the only Batson challenge arguably warranting this court's consideration was that made to prospective juror Thomas based on the State's assertion she appeared "weak, scary and shaky on the death penalty." However, peremptory challenges made by the prosecutor based on the body language of jurors have survived Batson challenges when accepted by a trial judge who possesses broad discretion in making the ultimate factual determination regarding purposeful discrimination. See, e.g., United States v. Bentley-Smith, 2 F.3d 1368, 1375 (5th Cir.1993) ("The reason certainly is stronger if the attorney is able to articulate an objective fact, such as that the juror was slow in answering questions or had to have questions repeated .... [but] the judge is free, based upon all the information presented and that judge's eyewitness observation of counsel, to conclude that the reason is offered in good faith and not as a subterfuge for race."). The trial court may consider in this context the legitimacy of the State's race-neutral reasons for excluding other prospective jurors. Hernandez, 500 U.S. at 370, 111 S.Ct. at 1872. Consequently, this claim lacks merit.

Assignment of Error Numbers 8 and 73
In his tenth argument, the defendant claims the trial court erred by failing to grant his motion for a change of venue.
The record reveals the defendant originally filed a motion for a change of venue before trial, and the trial judge deferred ruling on the motion. Thereafter, the court entertained the defendant's motion for individualized sequestered voir dire, ultimately denying the motion and ruling it would conduct voir dire half a panel at a time, and, if problems arose, he would later reduce the number of potential jurors called together. The record of the voir dire reveals a total of 71 prospective jurors were examined, 33 acknowledged some familiarity with the crime, and only five were excused because of their exposure to pre-trial publicity. At the conclusion of voir dire, the court again denied the defendant's motion for a change of venue.
*728 A defendant is guaranteed an impartial jury and a fair trial. La. Const. art. 1, § 16; State v. Brown, 496 So.2d 261, 263 (La.1986); State v. Bell, 315 So.2d 307 (La. 1975). To accomplish this end, the law provides for a change of venue when a defendant establishes he will be unable to obtain an impartial jury or a fair trial at the place of original venue. Bell, 315 So.2d at 309. Generally, the defendant bears the burden of showing actual prejudice. State v. Vaccaro, 411 So.2d 415, 424 (La.1982). However, in unusual circumstances, prejudice against the defendant may be presumed. State v. David, 425 So.2d 1241, 1246 (La.1983). Whether the defendant has made the requisite showing of actual prejudice is "a question addressed to the trial court's sound discretion which will not be disturbed on appeal absent an affirmative showing of error and abuse of discretion." State v. Wilson, 467 So.2d 503, 512 (La.1985), cert. denied, 474 U.S. 911, 106 S.Ct. 281, 88 L.Ed.2d 246 (1985). Changes of venue are governed by La.Code Crim.P. art 622, which provides:
A change of venue shall be granted when the applicant proves that by reason of prejudice existing in the public mind or because of undue influence, or that for any other reason, a fair and impartial trial cannot be obtained in the parish where the prosecution is pending.
In deciding whether to grant a change of venue the court shall consider whether the prejudice, the influence, or the other reasons are such that they will affect the answers of jurors on the voir dire examination or the testimony of witnesses at the trial.
Several factors are pertinent in determining whether actual prejudice exists, rendering a change in venue necessary, including: (1) the nature of pretrial publicity and the degree to which it has circulated in the community, (2) the connection of government officials with the release of the publicity, (3) the length of time between the publicity and the trial, (4) the severity and notoriety of the offense, (5) the area from which the jury is to be drawn, (6) other events occurring in the community which either affect or reflect the attitude of the community or individual jurors toward the defendant, and (7) any factors likely to affect the candor and veracity of the prospective jurors on voir dire. Brown, 496 So.2d at 263; Bell, 315 So.2d at 311. "The length to which the trial court must go in order to select jurors who appear to be impartial is another factor relevant in evaluating those jurors' assurances of impartiality." Murphy v. Florida, 421 U.S. 794, 803, 95 S.Ct. 2031, 2037, 44 L.Ed.2d 589 (1975). Because the constitution does not require the defendant be tried by a jury entirely ignorant of his case, the defendant cannot meet his burden by merely showing a general level of public awareness of the case. State v. Thompson, 516 So.2d 349, 352 (La.1987); Brown, 496 So.2d at 263.
This court and the United States Supreme Court have often examined the number of jurors excused for cause for having fixed an opinion as a gauge of whether prejudice exists in the public mind. It is not clear from the case law what minimum level of exposure is necessary to illustrate a corrupted atmosphere; however, this case clearly seems more in line with the level of exposure in cases in which courts have not been persuaded that the jurors' level of exposure required a change of venue. Murphy, 421 U.S. at 803, 95 S.Ct. at 2037 (that 20 of the 78 venire persons were excused because of their opinion about defendant's guilt "may indeed be 20 more than would occur in the trial of a totally obscure person, but it by no means suggests a community with sentiment so poisoned against petitioner as to impeach the indifference of jurors who displayed no animus of their own."); see also, State v. Connolly, 96-1680, p. 5 (La.7/1/97), 700 So.2d 810, 815 (although 86.33% (120 out of 139) potential jurors possessed some knowledge about the crime, most had only a vague recollection of the surrounding facts, and thus a change of venue was not required); State v. Wilson, 467 So.2d 503, 513(La.), cert. denied, 474 U.S. 911, 106 S.Ct. 281, 88 L.Ed.2d 246 (1985) ("Although a majority of prospective jurors (i.e. 24 of 39), admitted exposure to pretrial publicity, only four were excused for cause on ground of their formation of a fixed opinion.... A review of the responses of the potential jurors on voir dire *729 does not reveal the existence of collective community prejudice which could have denied defendant a fair trial before impartial jurors."); State v. Rodrigue, 409 So.2d 556, 559 (La.1982) (In a mock voir dire set up in order to determine the impact of media coverage by the Court, 26 of 30 prospective jurors had read or heard about the case, but only 9 had formed an opinion as to the defendant's guilt.); State v. David, 425 So.2d 1241, 1246 (La.1983) (Out of 112 jurors, 27 had read or heard about the case, but only six had an opinion, and four jurors said they could put their opinion aside). Compare, State v. Clark, 442 So.2d 1129, 1133 (La.1983) (motion for change of venue granted based on dry run voir dire in which 37 of 38 jurors recalled details of crime and only 6 out of 24 jurors in the last two groups questioned indicated their knowledge would not affect their decision). We find, that while there may have been a general awareness in the community regarding the crime, the defendant failed to establish that he was unable to obtain an impartial jury or a fair trial at the place of original venue. Consequently, the defendant's claim is without merit.

Assignment of Error Numbers 127, 128, and 129
In his eleventh and final argument, the defendant claims the court erred in defining intent, attempt, and the responsive verdict of manslaughter during the guilt phase of the trial. The record reveals trial counsel failed to object contemporaneously to any of the above instructions. Therefore, we decline to address these claims. State v. Hart, 96-0697, p. 10 (La.3/7/97), 691 So.2d 651, 660; State v. Taylor, 93-2201, p. 7 (La.2/28/96), 669 So.2d 364, 369.

Assignment of Error Number 126
In this assignment of error, the defendant claims the death sentence imposed violated the federal constitutional prohibition against cruel and unusual punishment and Louisiana's prohibition against excessive punishment. The substance of this assignment will be addressed in the Capital Sentence Review. infra.

Capital Sentence Review
The Eighth Amendment to the United States Constitution prohibits the infliction of cruel and unusual punishment. Similarly, Article I, section 20 of the Louisiana Constitution prohibits cruel, excessive, or unusual punishment. Under La.Code Crim.P. art. 905.9 and La.Sup.Ct.R. 28, this court reviews every sentence of death imposed by the courts of this state to determine if it is constitutionally excessive. In making this determination, the court considers whether the jury imposed the sentence under the influence of passion, prejudice or other arbitrary factors; whether the evidence supports the jury's findings with respect to a statutory aggravating circumstance; and whether the sentence is disproportionate, considering both the offense and the offender.

Passion, Prejudice, or Other Arbitrary Factors
The defendant, in prior assignments of error, claimed the prosecutor's improper remarks, the introduction of improper victim impact evidence, the use of the term "recommendation" when referring to the jury's sentencing verdict, and combinations thereof, interjected an arbitrary factor into the proceedings. We have already dismissed those issues individually finding then to be without merit, and we likewise find the jury did not impose the sentence under the influence of passion, prejudice or other arbitrary factors. Furthermore, the record does not appear to show any indicia of passion, prejudice, or arbitrariness.

Aggravating Circumstances
As demonstrated by the jury's verdict during the guilt phase, the State presented sufficient evidence to prove beyond a reasonable doubt the defendant was engaged in the perpetration of an armed robbery or an attempted armed robbery when he killed the victim. Furthermore, the defendant admitted the gun discharged during an attempted armed robbery during the penalty phase.

Proportionality
The federal Constitution does not require a proportionality review. Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 *730 L.Ed.2d 29 (1984). However, comparative proportionality review remains a relevant consideration in determining the issue of excessiveness in Louisiana. State v. Burrell, 561 So.2d 692, 710 (La.1990), cert. denied, 498 U.S. 1074, 111 S.Ct. 799, 112 L.Ed.2d 861 (1991); State v. Wille, 559 So.2d 1321, 1341 (La.1990); State v. Thompson, 516 So.2d 349, 357 (La.1987), cert. denied, 488 U.S. 871, 109 S.Ct. 180, 102 L.Ed.2d 149 (1988).
Jurors in the Nineteenth Judicial District Court, which comprises East Baton Rouge Parish, have recommended imposition of the death penalty on approximately 13 occasions. Several of the salient features of the instant case make it similar enough to other death sentences recommended by juries in the 19th JDC that the defendant's sentence is not disproportionate. See State v. Craig, 95-2499 (La.5/20/97), 699 So.2d 865, cert. denied, ___ U.S. ___, 118 S.Ct. 343, 139 L.Ed.2d 266 (1997) (The seventeen year old defendant kidnaped the victim while stealing his truck and ultimately drove him to a secluded area and shot him three times in the head); State v. Scales, 93-2003 (La.5/22/95), 655 So.2d 1326, cert. denied, 516 U.S. 1050, 116 S.Ct. 716, 133 L.Ed.2d 670 (1996) (The nineteen year old defendant, while engaged in the armed robbery of a Church's Fried Chicken, shot and killed one of the employees); State v. Taylor, 93-2201 (La.2/28/96), 669 So.2d 364 (During the armed robbery of the Cajun Fried Chicken restaurant where the defendant had previously been an employee, he shot and killed one employee and shot and permanently disabled and paralyzed another); State v. Williams, 383 So.2d 369 (La.1980), cert. denied, 449 U.S. 1103, 101 S.Ct. 899, 66 L.Ed.2d 828 (1981) (defendant shot and killed the victim during an armed robbery of an A & P Grocery Store). Moreover, the relevant jurisprudence suggests that single-shot armed robbery-murders survive proportionality review on a statewide basis. See State v. Lindsey, 543 So.2d 886 (La.1989); State v. Messiah, 538 So.2d 175 (La.1988), cert. denied, 493 U.S. 1063, 110 S.Ct. 880, 107 L.Ed.2d 963 (1990); State v. Thompson, 516 So.2d 349 (La.1987); State v. Bates, 495 So.2d 1262 (La.1986), cert. denied, 481 U.S. 1042, 107 S.Ct. 1986, 95 L.Ed.2d 826; State v. Byrne, 483 So.2d 564(La.), cert. denied, 479 U.S. 871, 107 S.Ct. 243, 93 L.Ed.2d 168 (1986); State v. Wingo, 457 So.2d 1159(La.), cert. denied, 471 U.S. 1030, 105 S.Ct. 2049, 85 L.Ed.2d 322 (1985); State v. Glass, 455 So.2d 659 (La.1984), cert. denied, 471 U.S. 1080, 105 S.Ct. 2159, 85 L.Ed.2d 514 (1985); State v. Knighton, 436 So.2d 1141 (La.1983), cert. denied, 465 U.S. 1051, 104 S.Ct. 1330, 79 L.Ed.2d 725 (1984); State v. James, 431 So.2d 399(La.), cert. denied, 464 U.S. 908, 104 S.Ct. 263, 78 L.Ed.2d 247 (1983); State v. Mattheson, 407 So.2d 1150 (La.1981).
With respect to the defendant's youth at the time of the crime, it should be noted that his age, 18 years old at the time the murder was committed, does not per se exempt him from the death penalty. See Thompson v. Oklahoma, 487 U.S. 815, 108 S.Ct. 2687, 101 L.Ed.2d 702 (1988). In fact, this court recently affirmed a death verdict returned by a jury in East Baton Rouge Parish to a defendant who was 17 years old at the time of the offense. State v. Craig, 95-2499 (La.5/20/97), 699 So.2d 865. A review of the entire state reveals also that this court has affirmed death penalties imposed on at least two other 17-year-olds. See State v. Comeaux, 93-2729 (La.7/1/97), 699 So.2d 16; State v. Prejean, 379 So.2d 240 (La.1979), cert. denied, 449 U.S. 891, 101 S.Ct. 253, 66 L.Ed.2d 119 (1980).
The Uniform Capital Sentence Report reveals the defendant is a black male born on December 9, 1975. He was eighteen years old at the time of the offense. The defendant was the only child born to deaf mute parents who never married. A daughter was later born to the defendant's mother and stepfather. The defendant lived with his mother and stepfather until he was 16 years old, at which time he moved in with his 27year-old girlfriend and her four children. His IQ was assessed by the defense psychologist at 80. He completed the ninth grade of high school before dropping out. At the time of his crime, he was working at a Church's Fried Chicken restaurant. In the psychological evaluation performed by the defense expert, Dr. Turin, Turin described the defendant as "exhibit[ing] many of the characteristics of an [a]ntisocial [p]ersonality *731 [but also possessing] several personality characteristics which are inconsistent with this personality disorder." Specifically, Turin referred to the defendant's "strong love and connection to his mother, grandmother, girlfriend and her children." She also noted instances in which the defendant acted selflessly "as evidenced by his supervisory role over deaf children at [a] church convention." Finally, she noted the defendant's positive work history, atypical of antisocials. In addition to the Cortana robberies, to which the defendant pled guilty to two counts of attempted simple robbery, the defendant was convicted as an adult of two counts of simple battery, one count of simple criminal damage to property and one count of trespass on June 22, 1994.
In light of this review, the sentence is not disproportionate.

DECREE
For the reasons assigned, the defendant's conviction and sentence are affirmed for all purposes, except that this judgment shall not serve as a condition precedent to execution, as provided by La.R.S. 15:567 until (a) the defendant fails to petition the United States Supreme Court timely for certiorari; (b) that Court denies his petition for certiorari; (c) having filed for and been denied certiorari, the defendant fails to petition the United States Supreme Court timely, under its prevailing rules for rehearing of denial of certiorari; or (d) that Court denies his application for rehearing.
AFFIRMED.
NOTES
[*] Johnson, J., not on panel. See Rule IV, Part 2, § 3.
[1] La. Const. art. V, § 5(D)
[2] Given this statement, the only contested issue at the guilt phase of the trial was whether defendant possessed specific intent to kill or inflict great bodily harm. See La. R.S. 14:30.
[3] Also assigned as error, but not argued by appellate counsel or objected to by trial counsel, were the court's grants of cause challenges to prospective jurors Horton, Hilton, Paul, Wheelock, Gales, West, Poche, Johnson, Simms, Comorda, Ramirez and Thibodeaux. Because trial counsel did not make a contemporaneous objection, we decline to address these assignments of error.

Additionally, objected to by trial counsel but not argued on appeal is whether the court erred when it granted the State's cause challenge to prospective venireperson, Susan Mitchell. Mitchell first informed the State that though she believed in the death penalty, she could not return a death verdict under any circumstances. Later, however, she told defense counsel that she could "consider" recommend a death verdict. Mitchell then admitted that she harbored prejudice against blacks. The State challenged her for cause based not only on her original statement that she could not return a death verdict but also on her expression of racial prejudice. After defense counsel objected to the ruling, stating that he believed she had been rehabilitated, the district attorney countered that he found it "incredible that a defense attorney [representing a black defendant accused of murdering a white victim] would object to a challenge for cause by the State on a white juror that expressed prejudice against a black defendant in a death case." The trial court ultimately sustained the State's challenge stating:
The ball [sic] regarding the challenges for cause is that I not only listened to what the jurors give in their answers, but I also consider their answers the way they're given in all of the relevant circumstances. I don't have to buy the poke just because somebody puts a pig in it. I'm going to grant the challenge for cause....
In light of the discretion accorded the trial judge, defendant does not show any error. See State v. Tart, 93-0772, p.16 (La.2/9/96), 672 So.2d 116, 124 ("A challenge for cause should be granted, even when a prospective juror declares his ability to remain impartial, if the juror's responses as a whole reveal facts from which bias, prejudice or inability to render judgment according to law may be reasonably implied. A trial judge has great discretion in determining whether sufficient cause has been shown to reject a prospective juror.") (citations omitted).
[4] The trial took place in May.
[5] When asked whether the defendant's age would affect her verdict, Ms. Lewis responded, "if they're young, to me, I think they should get life, not the death penalty."
[6] Furthermore, during the penalty phase, the defendant took the stand and admitted to one of the two aggravating circumstances alleged by the State. Specifically, the defendant admitted to shooting the victim during an attempted armed robbery.
[7] During the closing arguments of the guilt phase, defense counsel made reference to the defendant's "testimony" and the district attorney objected. In the subsequent bench conference, defense counsel withdrew the reference and stated he would say the defendant did not testify. However, defense counsel did not do as he said he would. Rather, defense counsel specifically made reference to the defendant's videotaped confession, which the district attorney played during his presentation of the evidence, and encouraged the jurors to believe the defendant's version of the facts. In rebuttal, the district attorney made the following statements: "He says Jimmy Ray Williams testified in court. Well, I object to that because I don't remember cross-examining him. I don't remember getting a chance."
[8] During voir dire, the trial judge defined reasonable doubt variously as a "serious doubt," a "sensible doubt," a doubt "based on reason and common sense" and a doubt that a "reasonable person could seriously entertain."
[9] The relevant portion of the final charge, with an emphasis on the allegedly offending language, reads:

The defendant is presumed to be innocent until each element of the crime necessary to constitute his guilt is proven beyond a reasonable doubt. The legal presumption of innocence is sufficient to create a reasonable doubt, and sufficient to base an acquittal on if it has not been properly rebutted by the State. The State accuses so the State must prove what they claim is true. The defendant begins the trial with a clean slate, and the burden is upon the State to prove the defendant's guilt to your satisfaction and beyond a reasonable doubt. In considering the evidence you must give the defendant the benefit of every reasonable doubt arising out of the evidence or out of the lack of evidence. If you're not convinced of the guilt of the defendant beyond a reasonable doubt you must find him not guilty.
Now while the State must prove guilt beyond a reasonable doubt, the State does not have to prove guilt beyond all possible doubt. Reasonable doubt is doubt based upon reason and common sense, and it's present when after you've carefully considered all of the evidence you cannot say that you are firmly convinced of the truth of the charge.
As to reasonable doubt, it's not a mere slight misgiving or possible doubt. You may say that it's self-defining. It's a doubt that a reasonable person would seriously entertain. It's a serious and sensible doubt. It's a doubt that you could give a good reason for. And while it's true that the State must prove the guilt of the accused beyond a reasonable doubt, that does not mean that the State has to prove the guilt of the accused to one hundred percent perfection or to an absolute certainty. That's because the law recognizes that human nature being what it is, all human endeavor will fall short of perfection. Therefore, it is sufficient, if after a full consideration of all the evidence that you are firmly convinced from that evidence that the accused is guilty beyond a reasonable doubt. A reasonable doubt can arise from the evidence or the lack of the evidence in the case.
[10] In Victor, the United State Supreme Court held that although the term substantial could be ambiguous and thus imply a doubt greater than required for acquittal under In re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), when read "in the context of the sentence in which it appears: `A reasonable doubt is an actual and substantial doubt ... as distinguished from a doubt arising from mere possibility, from bare imagination, or from fanciful conjecture' the ambiguity was removed and, as a result, the term "substantial" did not render the instruction unconstitutional." Victor, 511 U.S. at 19, 114 S.Ct. at 1250 (emphasis supplied).
[11] That instruction reads:

While the State must prove guilt beyond a reasonable doubt, it does not have to prove guilt beyond all possible doubt. Reasonable doubt is doubt based on reason and common sense and is present when, after you have carefully considered all the evidence, you cannot say that you are firmly convinced of the truth of the charge.
Louisiana Judges' Criminal Bench Book, Vol. I, § 3.03
[12] Cage was subsequently overruled on other grounds by Estelle v. McGuire, 502 U.S. 62, 72, 112 S.Ct. 475, 482, 116 L.Ed.2d 385 (1991).
[13] The code article provides in pertinent part:

"Upon motion of defendant, the court shall order the district attorney to inform the defendant of the state's intent to offer evidence of the commission of any other crime admissible under the authority of [La.Code Evid. art.] 404."
[14] The entirety of the officer's testimony is as follows:

Q: State your name for the record?
A: Tully Vincent.
Q: By whom are you employed, sir?
A: Baton Rouge City Police Department.
Q: Were you on duty on Monday, March 29, 1993, at approximately nine thirty-six p.m., thereafter?
A: Yes, sir, I was.
Q: Did you report to a call of a Cortana Mall that a person had tried to take the property of two women by intimidation?
A: Yes, sir, I did.
Q: Did you go to that location?
A: Yes, sir, I did.
Q: Did you chase down and catch a subject?
A: Yes, sir, I did.
Q: Did you have the victims brought back over to view him?
A: Yes sir, I did.
Q: And they identified him?
A: Yes, sir, they did.
Q: Do you see that person in court here today?
A: In the blue shirt, at the end of counsel table.
[15] The Court's holding was limited to the portions of the prior opinions which had previously held that evidence and argument relating to the victim and the impact of the victim's death on the victim's family were both inadmissable during the penalty phase. However, "Booth also held that the admission of a victim's family members' characterizations and opinions about the crime, the defendant, and the appropriate sentence violates the Eighth Amendment. No evidence of ... [this] sort was presented at the trial" in the Payne case. Payne, 501 U.S. at 830, n. 2., 111 S.Ct. at 2611, n. 2.
[16] An error is harmless if the jury's verdict was surely unattributable to it. Taylor, 93-2201 at p. 12, 669 So.2d at 371.
[17] Although we have mentioned the number of witnesses and the number of pages of transcript in our analysis, we have not entered into a quantitative analysis of how much information was put on by the State and the defendant in determining the likelihood of harm to the defendant. Rather, we only mention these numbers as illustrations of what evidence was presented during the penalty phase.
[18] The references during the final instructions read:

I should tell you that although you may consider any relevant mitigating circumstance you are limited to the aggravating circumstances included in the list that I will give to you. You may not base a death recommendation on any other aggravating circumstance.
Finally, just before the jury began deliberations, the court instructed it as follows:
As in your previous deliberations, you should deliberate only when you are alone. A sentencing recommendation of death, again, requires that all twelve of you agree on that recommendation. If after careful and conscientious effort to agree on a sentencing recommendation you find that you are unable to reach a unanimous agreement as to a sentencing recommendation the law requires that a sentence of life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence must be imposed.
You should now retire to deliberate on the sentence that you feel is fair and just under the circumstances that you have heard. Once you have a recommendation, please have the foreman complete the appropriate verdict sheet, knock on the door so that we can come back to court to receive your sentencing recommendation.
At this time I'll direct Mr. King to retire the jury. And the matter is now submitted to you for your recommendation.
[19] During his closing in the penalty phase, the district attorney argued

that the death penalty is the proper verdict in this case.... It is the penalty, and it's your decision, to be made one hundred percent on the evidence, nothing else. Your responsibility.
During his rebuttal, he admonished the jurors that "this verdict is one hundred percent yours, the verdict is one hundred percent your responsibility." Later in the rebuttal, the district attorney gave the jurors a graphic description about what a death verdict would mean, telling them:
... they going to put him on a gurney and inject him with needles. Yeah, I'm frank about that. I's standing here on behalf of the state of Louisiana, and based on the evidence, telling you that he deserves the death penalty. Well, I didn't want to put you into this position because I knew you were going to be in a position without fair disclosure. So I didn't try to soft sell that. I looked you straight in the eye and I asked you, do you believe in the death penalty? Do you think it's an appropriate penalty for first degree murder? If I proved to you that he committed first degree murder, and if I show you that the death penalty is the appropriate verdict, can you return it? Can you personally return it? Can you vote on it? And each and every person setting on this jury told me, yes.
[20] See n. 18, supra.
[21] Following the court's ruling on the admissibility of the other crimes evidence, defense counsel sought clarification about the standard the court had employed when deeming the evidence admissible. The following colloquy transpired:

Mr. Hecker: Your honor, could I ask one question, and it's not evidence, it's not argument. This lawyer was not certain on your ruling on Prieur, Did you use the preponderance of the evidence or clear and convincing evidence?
The Court: Frankly I think, it's both. The standard, I think, it's basically the same thing.
Mr. Sinquefield: It's clear and convincing under Prieur, but they argue that means preponderance, and they can argue that it means 50 percent, or I heard them argue that it means more likely than not, but it's all the civil standard of proof.
The Court: I find a preponderance of clear and convincing evidence in connection with the [s]tate's Prieur motion.
Mr. Hecker: Thank you, your honor.
Mr. Sinquefield: Thank you, your honor.
[22] Amar stated:

It depends, like I said, on the situation. If you're robbing somebody with a gun, you obviously, have plans to do more with it. And if more happens then I'm for it, but if you accidentally fall or something like that, and you don't have a gun, I mean, it all depends on the situation, different situations.