977 So.2d 160 (2008)
STATE of Louisiana
v.
Steven R. WILLIAMS.
No. 2006-KA-1327.
Court of Appeal of Louisiana, Fourth Circuit.
January 23, 2008.
*161 Eddie J. Jordan, Jr., District Attorney of Orleans Parish, Alyson R. Graugnard, Assistant District Attorney of Orleans Parish, New Orleans, LA, for Plaintiff/Appellee.
Laura Pavy, Louisiana Appellate Project, New Orleans, LA, for Defendant/Appellant.
Court composed of Judge PATRICIA RIVET MURRAY, Judge JAMES F. McKAY III, Judge MAX N. TOBIAS, JR.
JAMES F. McKAY III, Judge.
STATEMENT OF CASE
The charges in this case arise out of shootings that occurred on April 14, 2003. Charges were first brought against various defendants, including Steven Williams ("Williams"), on June 12, 2003, in case number 439-481. That case was transferred many times over the next eight months to various sections of court, and the State finally dismissed it in February 2004. On January 15, 2004, Williams was indicted in the present case on one count of second degree murder of Jonathan Williams (herein after sometimes referred to as "Jonathan")[1], one count of the conspiracy to commit second degree murder of Jonathan Williams[2], one count of aggravated battery of Robert Quinndolyn[3], one *162 count of aggravated battery of Michelle Brown[4], and one count of aggravated battery of Trakeida Barracks[5]. At Williams' arraignment on February 19, 2004, he pled not guilty to all charges. On April 8, 2004, the court found Williams competent to proceed. On May 8, 2004, the court held a suppression hearing in the case and then reset the matter. There is no indication of the court's ruling. Nonetheless, on December 3, 2004, the court granted Williams' motion to sever his trial from those of his codefendants. This Court denied the State's writ application from this ruling. State v. Williams, unpub., 2004-2197 (La.App. 4 Cir. 1/26/05).
On April 4, 2005, the matter came to trial on counts one, two, and four (second degree murder, conspiracy to commit second degree murder, and the aggravated battery of Michelle Brown) against Williams. On April 12, 2005, the jury found him guilty as charged on all three counts. On April 29, he filed a motion for new trial, and the State nolle prosequied the remaining two counts against him. On August 26, 2005, the court denied the motion for new trial. The defendant waived all delays, and the court sentenced him to life imprisonment without benefit of parole, probation, or suspension of sentence on the murder count, to serve thirty years at hard labor without benefits on the conspiracy charge, and to serve ten years at hard labor on the aggravated battery count, the sentences to run concurrently. The State then filed a multiple bill in connection with the conspiracy charge. He pled not guilty to the bill. The court heard the matter and found him to be a second offender. The court vacated the thirty-year sentence and imposed a sentence of forty years at hard labor without benefits as a second offender. The defense counsel objected to the sentences and filed motions for appeal and to withdraw from representation. The court granted both motions and appointed the Louisiana Appellate Project to represent Williams.
FACTS
On the morning of April 14, 2003, three men entered the grounds of John McDonogh High School on Esplanade Avenue. While one man remained outside the gym, the other two men entered the gym, brandished weapons, and shot Jonathan to death. They also wounded several other students, including Michelle Brown. The men then fled in a red 1995 Oldsmobile Cutlass automobile ("red Cutlass").
Officer Bruce Haney testified that he was employed by the New Orleans Police Department ("N.O.P.D.") as the school's resource officer. He stated that the school was located on Esplanade between North Robertson and North Dorgenois Streets, extended back to Barracks Street, and the school's gym was located on Barracks. He testified that although there is a fence around the school, at the time of the shooting there was a blighted house that was adjacent to the gym, and one could enter the schoolyard through this house. Although he was not on campus at the time of the shooting, he immediately returned there upon hearing of the shooting and found Jonathan lying in the gym. He stated that Jonathan had been shot multiple times in the head and body. He also testified that other students were hit by gunfire, and one student was injured when the students tried to flee the gym during the shooting.
*163 Michelle Brown testified that she and her friends had entered the gym during second period that morning and were planning a baby shower for a friend. She stated that she saw two men, not in school uniform, enter the gym. She stated that she saw a group of students get up, and then she saw that one of the men had pulled a gun. She testified that she also got up and ran when she heard shots. She insisted that she did not get a look at the men's faces. After she ran out of the gym, she realized that she had been shot in the thigh. She fled to a nearby house, from which the resident called the police.[6] She testified that the bullet was still in her leg because she could have been paralyzed if it had been removed.
On cross-examination, Ms. Brown testified that she gave a taped statement to the police sometime after she got out of the hospital. She testified that she believed she described one of the shooters as being around 5'7" tall, but she could not recall how tall the other shooter was. She described the gun she saw as being long, but she admitted she did not know much about guns. She stated that she ran out of the gym as soon as she saw the gun, and she continued to hear gunshots as she ran out of the gym.
Dr. James Traylor was qualified as an expert in forensic pathology. He testified that he conducted the autopsy on fifteen-year-old Jonathan Williams the morning after the shooting. He stated that during the autopsy he discovered a gun in the waistband area of Jonathan's pants, and the gun appeared to have been damaged by a gunshot, although the site of Jonathan's injuries did not correspond to the damage to the gun. Dr. Traylor testified that Jonathan sustained ten gunshot wounds: (1) a wound above Jonathan's left knee; (2) one in the forearm which exited through his wrist; (3) one that lodged in Jonathan's upper left arm and from which a bullet was recovered; (4) one at the top of Jonathan's armpit; (5) one that entered Jonathan's left back and exited his chest, causing injuries to his left lung, heart, and rib causing massive bleeding; (6) one that entered Jonathan's right upper back and exited through his chest, damaging his ribs and his right lung; (7) one that entered Jonathan's right eye and exited through the top of his head; (8) one that passed through the abdominal skin wall; (9) one to the side of Jonathan's left leg that exited through the upper portion of his leg; and (10) a bullet jacket entry wound to his left thigh. In addition, Dr. Traylor testified that Jonathan had a laceration to the base of the left side of the neck caused by a lead fragment. Dr. Traylor testified that the head wound and the wound that damaged Jonathan's heart were both fatal wounds. He also stated that some of the wounds came from behind Jonathan, while others came from in front of him. He testified that fluids taken from Jonathan's body were negative for alcohol or commonly abused drugs.
Officer Ray Jones testified that he and his partner were patrolling in an unmarked car when they received the broadcast of the shooting and the description of the suspected getaway car, a red Cutlass. He testified that he and his partner drove around the area of the shooting, and as they drove down Onzaga Street they passed North Tonti Street and saw a car on North Tonti that matched the description. Officer Jones testified that he saw three African-American males exit the car and open the trunk. He stated that one of the men was taller than the other two, and one of the shorter men retrieved a gun from the trunk. One of the men then ran *164 to the house at 1668 North Tonti, either entering the house or going down the side alleyway. The red Cutlass then left the scene. Officer Jones testified that he and his partner turned and drove down the street, but by that time the red Cutlass was gone and the men were not in sight. They notified the S.W.A.T. team and drove to the house where they had seen the men. Officer Jones testified that at some point, other officers entered the residence and removed three or four people from the residence. He did not enter the residence, but he walked down the alleyway to the back yard and saw that the back fence to the yard behind the residence had been pushed down. He looked over the fence and discovered a rifle, possibly an AK-47, lying on the ground in the next yard.
On cross-examination, Officer Jones again testified that when he first spotted the red Cutlass from Onzaga Street, he saw three men exit, and one of the men retrieved a rifle from the trunk. He then saw one of the men approach the residence, while the other two men re-entered the car. He did not see a fourth man leave the car. He stated that the S.W.A.T. team removed one man from the house who matched the height of the man he saw run toward the house with the gun.
Lieutenant Darryl Albert testified that he responded to the call of the shooting and then drove around the area looking for the red Cutlass. He testified that he spotted the car a few blocks from the shooting scene as it was driving toward him. He stated that he made a U-turn and followed the car, which fled and ran a stop sign. He testified that the car stopped in the 1500 block of North Rocheblave Street, and three men ran from the car to the residence at 1522 North Rocheblave. He stated that the occupants of the car closed its doors, but the car was still running. He testified that he hid behind a car parked in front of the red Cutlass, and soon thereafter a female he identified as Michelle Fulton walked out onto the front porch. He yelled to her, asking where "they" went. She replied that they went to the corner, but Lieutenant Albert knew she was lying because he did not see them run that way. He heard noises coming from inside the residence, and then a man came out onto the porch. Both the man and the woman refused to come to the officer, and the man went back inside. Lieutenant Albert testified that he stayed where he was until backup officers arrived. The officers entered and found one man hiding in a closet and another hiding under a bed. Lieutenant Albert insisted that Ms. Fulton was not in the red Cutlass when it passed him and that only men were in the car.
Lieutenant Michael Kahn testified that he responded to the call for backup at 1522 North Rocheblave and helped secure the premises. He testified that when he went up onto the porch, a man came out and said there was no one else inside. However, he could hear noises coming from inside, and he entered through a partially-open door. Once inside, the officers found Hebert Everett hiding in a closet in the back bedroom and Tyrone Crump hiding under a bed in that room.
At trial, Ralph Anderson ("Anderson") testified that he was currently incarcerated in St. Charles Parish for an unrelated second degree murder, had pending cocaine and marijuana charges, and had a prior juvenile adjudication for armed robbery. He further testified that he lived at 1668 North Tonti at the time of the shooting. He admitted that he originally was charged in the present case with second degree murder, but he made an agreement with the State to testify against the defendant Williams in exchange for which he pled guilty to being an accessory after the *165 fact to second degree murder. He testified that he was arrested on April 14, 2003, at his house and gave a statement to the police that day. He admitted that in that statement he lied when he said that Raymond Brown, a codefendant, had a gun when he got out of the red Cutlass at the school, when he said Williams took the rifle out of the trunk of the red Cutlass in front of his house, and when he said that he did not go to Brown's house after the shooting.
Anderson described his association with the various codefendants in this case. He testified he and Williams went to school together. Michelle Fulton was related to his cousin. He had known Raymond Brown since elementary school, and he testified that Brown lived on North Johnson Street. He had known Herbert Everett since junior high school, and he and Tyrone Crump grew up together. Anderson had only known James Tate for a short time before the shooting. Anderson had known Larry Moses since elementary school, and he stated that Moses lived on North Rocheblave. He identified photographs of Williams, Tate, Moses, Brown, Everett, and Crump.
Anderson testified that a few days prior to the April 14 shooting, Williams had given him an AK-47 to keep for him because Williams had no place to store it, and Anderson hid the gun in his house. Anderson stated that sometime between 7:30 and 8:00 a.m. on April 14, Williams arrived at his house, asking to use the telephone. Anderson testified that after using the phone, Williams left. However, he returned around 8:00 a.m. and asked Anderson for the gun. Anderson gave him the gun, and Williams walked down toward the corner. At that time, Crump and Everett pulled up to his house in a red Cutlass, and Williams walked back to them. Anderson stated that Crump and Everett indicated they were going to pick up some marijuana, and he and Williams got in the car with them. Anderson testified that they drove to Raymond Brown's house at 2012 North Johnson, and when they arrived at the house the other three men left the red Cutlass, while Anderson remained in the car listening to music. Anderson estimated that the trio was inside for the duration of four songs, and then they emerged, accompanied by Brown, Michelle Fulton, and James Tate. Anderson testified that Everett, Crump, and Ms. Fulton walked to a white Pontiac Bonneville ("white Bonneville") automobile parked at the corner, while Williams, Tate, and Brown entered the red Cutlass. Anderson testified that Williams still had the AK-47 with him and that Tate, who sat in the back seat with Anderson, was armed with a nine millimeter gun.
Anderson testified that Brown then drove the red Cutlass away from his house. Anderson insisted he did not know where they were going, but during the ride he heard Brown say, "he's in the gym." He testified that they pulled up on North Rocheblave on the side of the John McDonogh High School gym. Anderson testified that Brown, Williams, and Tate left the car, but he remained inside. He stated that he soon heard gunshots coming from the direction of the gym, and he saw students running out of the gym. He testified that he then saw Williams, Tate, and Brown come out of the schoolyard and they got back into the red Cutlass. Anderson stated that Williams and Tate still had their guns when they got back into the car. He stated that Tate hid his gun in the air bag compartment of the red Cutlass. Anderson described Tate, Brown, and Williams as happy when they returned to the car. They then drove from the scene, and as they turned onto Barracks Street, Anderson saw the white Bonneville behind them. Brown drove *166 back to his house, and when they arrived Crump, Everett, and Ms. Fulton were already at the house, although he did not see the white Bonneville. Once there, Brown and Tate went inside, while Williams put the AK-47 in the red Cutlass' trunk.
Anderson testified that he asked Everett to take him home, and he, Everett, Crump, Ms. Fulton, and Williams entered the car. Everett drove back to Anderson's house, and when they arrived, Anderson and Williams exited the car. Anderson testified that Williams walked down the side alleyway of the house, and he (Anderson) opened the trunk and removed the AK-47. Anderson testified that as he did so, he looked up the street and saw a police car passing by. He testified that he also walked into the alleyway to the back yard and threw the gun into the abandoned lot behind his house. Anderson then told Williams about seeing the police in the street, and Williams fled. Anderson went inside his house through the back door, took off his clothes, and put on his pajamas. He testified that soon his brother-in-law called the house to say that the police would not let him come down the street, and his sister screamed at him (Anderson) to tell her why police officers were outside the house. Soon thereafter, the police arrived, and at the officers' command Anderson surrendered.
Anderson testified that Ms. Fulton was Brown's girlfriend, and Brown's cousin Hilliard "Head" Smith had been shot and killed a few days earlier. He identified Rosetta Williams as Everett's grandmother and Ramona Brown as either Raymond Brown's mother or sister. He identified Shandrika Crump as Crump's sister.
Anderson testified that at the time of the shootings Williams had tattoos of an AK-47 with the words "Fifty N____s" on his neck. He also had a tattoo of "MOB" on his forearm, which Anderson indicated meant "Money Over Bitches," as well as teardrop tattoos under his eye.
Anderson testified that he did not tell the police on the day of the shooting about where Tate had hidden his gun, but he did so later when he learned from Tate that the gun was probably still hidden in the airbag compartment of the red Cutlass.
On cross-examination, Anderson testified that although he was allowed to plead guilty to the lesser offense of accessory after the fact to second degree murder, he had not yet been sentenced. He insisted that the plea agreement did not include his pending cocaine charge. He admitted that he lied on the points listed above in the taped statement he gave to the police on the day of the shooting, but he insisted that he corrected these lies after obtaining counsel and signing his plea agreement. He also admitted that he did not tell the police that he had the AK-47 prior to the day of the shooting until after his sister had already told the police about the gun. He admitted that he initially told the officers that he told Brown to let him out of the car shortly after the shooting and did not tell them that he returned to Brown's house with the other three men. He testified that in his statement he told the officers that Williams was 5'9" tall, but Williams was taller than he was, and he was 5'9" tall. Anderson testified that he also failed to tell the officers that he had used the AK-47 the night before the shooting to scare away someone who had parked in front of his house and had threatened him. Anderson also admitted he lied when he told the officers that Crump carried a gun that day, although he saw Crump with a gun the day before the shooting.
Anderson testified that the reason why he did not ask either Tate or Williams on the morning of the shooting why they had guns was because they usually carried *167 weapons. He also never questioned where they were going once they left Brown's house. He stated that the other men had been out of the car only two to three minutes before he heard the gunshots. Anderson insisted that he did not ask the men what had happened once they returned to the car. Anderson testified that he was arrested at his house around noon, and he gave his statement around 8:00 p.m. He testified that he was in custody with Arthur Francis, but he denied seeing Francis either at Brown's house or at the school. Anderson also testified that he did not go to Larry Moses' house after the shooting, and he had no idea what occurred at 1522 North Rocheblave. He did not remember if he had told the police that Moses' house was considered a safe house where they would meet if anything went wrong.
Sergeant Fred Austin testified that he was assigned to supervise the scene at 1522 North Rocheblave. He identified several photographs taken at the house. He identified Everett as one of the men captured at that residence, and while Everett was standing outside a police car, they heard a broadcast that a gun had been found. Sergeant Austin testified that at that point, Everett stated that he had a clip for that gun in his pocket. The officers then seized the clip as well as a loose bullet from Everett's pocket. Sergeant Austin testified that the clip and bullet seized from Everett were nine millimeter caliber and would not have fit the AK-47.
Detective Winston Harbin testified that when he arrived on North Rocheblave Street, the red Cutlass was running. He testified that he shut off the motor, closed the door, and waited for the arrival of a search warrant. He identified the residence as that of Larry Moses, and he testified that he interviewed Moses' mother, Ann Minor. He testified that nothing was seized from the residence. He testified that the police searched Brown's house on North Johnson and seized a cell phone, several pieces of clothing with "RIP Head" decals, and one live nine millimeter round. He made no arrests at this address. He also interviewed two witnesses who gave no information linking Williams to the shooting. Detective Harbin testified that the temporary tag on the red Cutlass was registered to a different vehicle.
James Podboy was qualified as an expert in the collection of latent fingerprints. He examined various objects seized in connection with this case. The AK-47, the nine millimeter gun, the clip, and a magazine with nine millimeter. rounds were negative for latent prints, while the ammunition had no latent prints. Mr. Podboy testified that the likelihood of getting prints from a spent shell was next to impossible due to the conditions under which it was fired. He found six partial latent prints on the red Cutlass. The parties stipulated, however, that these prints were never submitted for comparison.
Officer Kenneth Leary was qualified as an expert in firearms examination. He testified that he tested various casings and fragments collected at the scene of the school shooting and compared them to the AK-47 seized from the yard behind Anderson's back yard, the nine millimeter gun seized from the red Cutlass, and the gun found in Jonathan's waistband at his autopsy. Officer Leary testified that several nine millimeter casings collected at the school matched casings fired from the gun seized from the red Cutlass. They also matched casings found at the scene of Hilliard Smith's murder on Dumaine Street. A bullet found during Jonathans' autopsy had similar rifling characteristics to the test fired bullet from that gun, but *168 Officer Leary testified that these characteristics were insufficient for him to conclude that it had been fired from that gun. Officer Leary also matched several 7.62 millimeter casings and copper bullet jackets collected from the school to the AK-47, as well as a copper jacket fragment found during Jonathan's autopsy. He was unable to match a 7.62 millimeter bullet found during the autopsy. Officer Leary testified that none of the bullets, casings, or fragments was linked to the gun found in Jonathan's waistband.
Detective Anthony Small testified that he prepared search warrants for the North Rocheblave, North Johnson, and North Tonti residences. He testified that he was present for the search at North Tonti, and pursuant to the warrant they seized a photo album with pictures, some cards, and some letters. He also seized the AK-47 from the yard behind Anderson's home. He testified that later while he was at the police station he confiscated a cell phone from Everett that Everett told him belonged to "Pookie," whom Detective Small believed was Crump.
Detective Small testified that over five months after the shooting he met with Cheniere Parker[7], a witness to the shooting. At that time, he showed Ms. Parker several photographic lineups. From one she chose Tate's photograph, noting that she saw him shoot Jonathan. From another she chose Ms. Fulton's photo. From a third she chose that of Brown, indicating that she saw him standing by the gym door. Ms. Parker chose no one from a fourth lineup, which included a photo of Arthur Francis. However, she chose Williams' photo from a fifth lineup, on which she wrote: "Shot Caveman, longer gun." Detective Small explained that Jonathan's nickname was Caveman. Detective Small indicated that no one else in the lineup containing Williams' photo had a tattoo under his eye. Detective Small testified that after looking at the lineups, Ms. Parker gave a statement. He stated he did not show Ms. Parker a lineup with Anderson's photo.
Detective Daniel McMullen testified that he was the lead investigator in the shooting. He testified that when he arrived at the scene, he saw Jonathan's body lying in the gym, and there were casings lying all around the gym. He identified several photographs taken at the scene, including one that showed a hole in the fence next to the abandoned house. He testified that the city knocked down the blighted house next to the gym three days after the shooting. He testified that Ms. Fulton and Larry Moses were arrested on the porch of 1522 North Rocheblave. He testified that Anderson, who was arrested at his house, agreed to cooperate with the police, and Anderson identified photographs of Williams, Brown, and Tate. Based on Anderson's account of the shootings, he obtained arrest warrants for Brown, Tate, and Williams. Detective McMullen testified that all three men were arrested the next day. He testified that three cell phones were seized from the red Cutlass.
Detective McMullen stated that after speaking with Anderson a few months after the shooting, he learned about the gun hidden in the red Cutlass, and he obtained a second search warrant for the car. Pursuant to this warrant, they seized the gun, the radio, and several CDs. The police also found in the red Cutlass an oil change receipt in Everett's name dated a few days before the shooting and a notary receipt for the sale of the white Bonneville. This receipt indicated that the car had been purchased by Robin Stallsworth, who had the same address as Everett. Detective *169 McMullen testified that the police never found the white Bonneville.
Detective McMullen testified that he interviewed Cheniere Thomas, who was a witness to the shooting. Detective McMullen showed Ms. Thomas a lineup from which she chose Brown's photo as the person who was standing near the gym at the time of the shooting. She also viewed a lineup containing Arthur Francis' photo, which she chose with the notation that he "seems to fit the description" of one of the two men who walked into the gym and opened fire. She viewed a third lineup from which she chose Williams' photo, indicating that the defendant, Williams, entered the gym partially covering his face with his hand, but she was able to see marks on his face.
On cross-examination, Detective McMullen admitted that the statement Anderson gave him just after the shooting was not completely accurate. Detective McMullen testified that he spoke with Anderson again a few months after the shooting, after the plea agreement had been reached, and at that time Anderson changed some of his statements and told the police about the gun hidden in the red Cutlass. Detective McMullen stated that he first found out from Anderson's family members that Anderson had the AK-47 prior to the shooting. Detective McMullen testified that he told Mr. Podboy to test only the interior of the red Cutlass for fingerprints, but he did not order Mr. Podboy to test the six partial latent prints Mr. Podboy was able to pull from the car's interior. Detective McMullen stated that no physical evidence linked to Williams was found in the red Cutlass. He testified that Ms. Thomas later recanted her identification of Arthur Francis. With respect to the lineup containing Williams' photo, Detective McMullen testified that two other men in the lineup had marks on their faces. He also testified that Anderson told him that the general plan of the group was to meet at Larry Moses' house if they encountered trouble.
Detective McMullen testified that at the time of the shooting Williams lived at 1233 Marigny Street and Trump lived at 4916 Eastern Street. He stated that the only DNA testing the police conducted was on a hat found at the scene, and this testing showed that the hat belonged to Jonathan. He stated that the police did not test the clothes Williams was wearing at his arrest because he was not arrested until the day after the shooting. He testified that he did not show Anderson's photograph to any witness because he did not fit the descriptions given by witnesses, but Williams matched some of those descriptions. He testified that casings found at the scene of Hilliard Smith's murder matched those fired from the gun found in the red Cutlass, but those taken from Smith's body did not match this gun.
The jury was transported to view four scenes: the school at 2426 Esplanade, 1522 North Rocheblave (Larry Moses' house), 2012 North Johnson (Brown's house), and 1668 North Tonti (Anderson's house).
Sergeant Michael Boudy testified that the day after the murder he was dispatched pursuant to a call of suspicious people, possibly those involved in the school shooting, to the 2500 block of Music Street.[8] He and his partner went to that area and were directed to a house in that block. He stated that they walked down the alleyway to the back yard, and two men came out of the house and put their hands on the wall, having been directed to do so by one of the men's grandmother. The officers arrested these men, Williams *170 and James Tate. The parties stipulated that Sergeant Boudy's partner's testimony would identify the clothing seized from Williams at his arrest.
The parties entered into stipulations involving the cell phones found in the red Cutlass and one seized at Brown's house. Telephone records indicated that the cell phones found in the red Cutlass were not active at the time of the shooting. Records also showed that the cell phone seized from Brown's house had only been used for directory assistance calls and calls to an automated payment service.
Sergeant Cynthia Patterson testified that she checked records of various cell phones of the people involved in the shooting. Sergeant Patterson outlined in great detail the steps that she took to obtain this information. She testified that the cell phone seized from Everett was listed to Margaret Johnson, who lived in an apartment on Martin Luther King Boulevard. She testified that she obtained a penlink of the calls made to and from this phone from 12:12 a.m. to 3:22 p.m. on the day of the shooting. She testified that the link showed that three calls were made to Williams' mother's landline number between 7:51 and 8:22 a.m. There was another call to that number at 9:17 a.m. The link showed two incoming calls at 10:10 and 10:42 a.m., with a third incoming call at 11:20 a.m. The link showed an outgoing call to Larry Moses' landline at 1522 North Rocheblave at 11:09 a.m. Sergeant Patterson testified that there were no outgoing calls after 11:14 a.m. Sergeant Patterson testified that she was not asked to get penlinks for any landlines or for Anderson's phone.
The parties stipulated that if an expert in the testing and analysis of gunshot residue were to appear, he would testify that no particles classified as unique to gunshot residue were found on Anderson's hands. He would also testify that the results of the testing were inconclusive and did not eliminate the possibility that Anderson may have handled or discharged a gun.
Detective John Ronquillo testified that he met with Cheniere Thomas and DeSheila Turner, both teachers at the school, and separately showed them a photograph of Ms. Fulton. He testified that both teachers knew Ms. Fulton and identified her as being on the school grounds on the morning of the shooting.
DeSheila Turner testified that she was a physical education teacher at John McDonogh High School. She testified that school started at 8:00 a.m., and second period began around 9:40 a.m. She testified that on April 14, 2003, she saw Ms. Fulton sitting outside the gym, talking to other girls. She stated that Ms. Fulton was in her first period P.E. class, but she was not in uniform, and Ms. Turner realized that Ms. Fulton was not going to be in class. Instead, Ms. Fulton was wearing a shirt which showed a memorial to someone who had been killed, as well as a bandana tied around her head and one on her leg. Ms. Turner testified she left the school for a brief time but returned soon thereafter.
Ms. Turner testified that when the bell rang for second period, she noticed that Jonathan was in the gym shooting baskets, even though he did not have P.E. that period. She asked him to leave, and he indicated he would do so in five minutes. Jonathan then walked to the other end of the gym. Ms. Turner testified that about five minutes later, she saw two men enter the gym, neither of whom she or her coworker knew. She testified that she called to them to see if she could help them, but they ignored her. She then walked over to them and was going to tap one of them on the shoulder when she heard students on her left gasp and her coworker yell, "Oh, sh__." She looked at her coworker *171 and then back at the men. Because she was behind them, she could not see their faces, but she saw one of them raise his shirt and pull a long gun out of his pants. She testified that the lighter complexioned of the two men was taller than the darker one, and the lighter one was wearing a T-shirt and jeans with patches on them. She testified that she ran and then heard gunshots. She testified she ran to the office to report the shooting and then ran back to the gym, where she saw Jonathan's body lying on the floor. Ms. Turner estimated that there had been about 150 students inside the gym when the shooting occurred.
On cross-examination, Ms. Turner testified Cheniere Thomas was her coworker that day. She testified that she saw Ms. Thomas running out of the gym during the shooting. Ms. Turner testified that she did not see Ms. Fulton after seeing her at the beginning of first period. She stated that she did not know that Jonathan was armed at the time of the shooting. She stated that she did not notice any markings on either of the shooters' necks. She stated that she saw the suspects' photographs on television before she gave a statement, but as she did not see the shooters' faces she did not recognize any of the suspects.
Cheniere Thomas testified that she was also a P.E. teacher at John McDonogh on that morning, working with Ms. Turner. She testified that during first period, she saw Ms. Fulton, who was out of uniform and wearing a memorial T-shirt with "Head" printed on it, as well as a bandana on her leg and her wrist. Ms. Thomas testified that when she asked Ms. Fulton where her uniform was, Ms. Fulton replied that she "had to represent my n____." Ms. Thomas did not see where Ms. Fulton went after that, nor did she see her with a cell phone.
Ms. Thomas stated that during second period, she noticed that Jonathan, who was a special education student, was in the gym even though he did not have P.E. during that period. She also saw two men, not in uniform, enter the gym. She stated that the taller man was trying to hide his face, while the shorter one tried to hide behind the taller one. She described the taller one as being 6' to 6'1", wearing a white T-shirt and jeans with "blocks" of fabric on them. She described the other one as 5'5" to 5'7", with a darker complexion than the first man, wearing a white T-shirt and black pants. She testified that she asked Ms. Turner if she recognized either of them, and Ms. Turner indicated she did not. She testified that as Ms. Turner approached the men, they raised their shirts, and she saw the barrel of a gun. She testified that she screamed, "Oh, sh__, they got a gun," and ran out of the gym. She testified that as she ran, she heard gunshots. She stated that as she ran out of the gym, she noticed a third man standing outside. She testified that she went to get help, and when she returned to the gym she saw Jonathan's body and collapsed.
Ms. Thomas testified that she did not speak with the police until about a month later because she was so upset. She stated that she identified a photograph of Ms. Fulton, and she viewed several photo lineups. From one she chose the photo of Brown as the man she saw standing outside the gym. From another she chose the photo of Arthur Francis, upon which she made the notation that he "seems to fit the description." Ms. Thomas testified that she knew Francis as he had been her student in the past, but a few months later she realized that she had made a mistake in identifying him because he was not present at the shooting. She also viewed a lineup from which she chose Williams' photo, *172 indicating on the photo that he "fit the description, face partially covered by right hand, remembers marks on face." Ms. Thomas testified that although she was wrong in her identification of Francis, she was one hundred per cent sure of her other identifications. She testified that although she could not testify that Williams shot Jonathan, she saw him with a gun in his hand as she ran out of the gym.
On cross-examination, Ms. Thomas testified that although she saw marks on Williams' face, she did not know what the marks were. She stated that she did not see any tattoos on Williams' neck, but his back was not to her. She did not notice any tattoos on his arms. Although she admitted she may have seen a few news reports including the defendants' photographs, she insisted that she did not watch the news very much after the incident on the advice of her psychiatrist due to the anxiety she had in the aftermath of the shooting. She testified that she viewed the lineups in May, and then in late June or early July she realized she was mistaken when she identified Francis. By that time, she had begun viewing newscasts and had begun reading the newspaper again. She insisted that although she had written on Williams' photo that he seemed to fit the description, she was positive he was one of the men she saw in the gym just prior to the shooting, explaining that at the time of her identification she was hesitant due to her mental condition. She testified that three men in the lineup containing Williams' photo had marks under their right eyes. She stated that she would have told the police if she thought she had mistakenly identified Williams as well as Francis.
Chanisha Parker testified that she attended John McDonogh both at the time of trial and at the time of the shooting. She testified that she was in the gym during second period that day, even though she did not have class there at that time. She testified that prior to entering the gym, she saw James Tate standing outside the gym. She stated that she knew him from junior high, and she tried to get his attention. However, she was unable to do so, and she went into the gym. She testified that Tate was standing with two other men, and all three were wearing white T-shirts and dark jeans. Ms. Parker testified that prior to entering the gym, she saw a boy walk up to the three men and tell them, "Yeah, he's in there, he's at the end." Ms. Parker testified that once inside, she sat down next to Jonathan, whom she knew as Caveman. She testified that two men then entered the gym, and Jonathan jumped up and ran toward some doors. The two men began shooting, and Ms. Parker did not run at first because she feared being shot. She eventually fled the gym.
Ms. Parker described Tate as short with a medium build, dark skin, and wearing a hat. She testified that he brandished a handgun. She described the other shooter as taller, thin, with lighter skin, and he brandished a large gun that he had to hold with both hands. She testified that both men were shooting at Jonathan.
Ms. Parker testified that because she was scared, she did not contact the police until September. She testified that she identified a photograph of Ms. Fulton, but she did not see her on the scene. She stated that she viewed one lineup (which contained Francis' photo) and chose no one from that lineup. She chose Brown's photo from another lineup, on which she indicated that she had seen him standing near the gym door. She chose Tate's photo from another lineup, on which she wrote: "shot Jonathan Williams with a handgun." She chose Williams' photo from yet another lineup, on which she wrote: "shot Cave *173 Man with the longer gun." Ms. Parker then identified Williams in court as the man with the longer gun whom she saw shooting at Jonathan.
On cross-examination, Ms. Parker estimated that she tried for three to four minutes to get Tate's attention prior to entering the gym. She testified that although she had said in a statement that the taller shooter was 5'5" tall, he was really around 5'11" tall. She testified that she did not remember any tattoos on the shooter's arms, but he had teardrop tattoos under his eye. She stated that she did not see the shooters leave because she fled the gym before they did. She denied that the tattoo was the reason why she identified Williams; rather, she identified him because she recognized his face.
The defense called Ralph Anderson, who testified that he first saw Williams around 8:00 on the morning of the shooting. Anderson denied speaking with Williams on the phone that morning. He estimated that he, Williams, Everett, and Crump left his house around 9:00 that morning. He stated that on the way to the school, there was no discussion of changing cars or about going to a safe house if things went wrong. He testified that he knew of the possible penalty he faced at the time of his plea agreement for a first or second degree murder charge. He denied knowing the penalties for the other offenses.
Laurie White, Anderson's attorney, testified that she advised Anderson of the various penalties for the offenses in this case. She testified that the plea agreement pertained to "any other crime relating to the charged incident." In response to defense counsel's questioning, Ms. White testified that a teardrop tattoo is not uncommon in young men. On cross-examination, over defense objection, Ms. White testified that each teardrop of the tattoo represents a person killed by the tattoo wearer, representing a tear that a mother shed for the death of her child. Ms. White testified that she knew of no other meaning for the tattoo.
Williams testified that he had been incarcerated since the day after the shooting. He stated that he had attended school only through eighth grade, and he had a prior conviction for unauthorized use of a motor vehicle, for which he received a suspended sentence.
Williams testified that on the night before the shooting, he had spent the night at his friend Jerome's house. He testified that the next morning he was walking toward a bus stop to go home at around 8:00 or 8:30 when he passed Anderson's house and saw Anderson on his front porch. He testified that he asked to use Anderson's phone to see if his mother was home before he got on the bus. He stated that Anderson showed him an AK-47 and a nine millimeter gun that he had in his back yard, and Anderson told him he wanted to use them to rob someone. Williams testified that he declined to join Anderson, telling Anderson that he had just been released from probation. Williams testified that he went back to Jerome's house, where he fell asleep.
Williams testified that after he awakened at Jerome's house, he saw on the news that he was wanted by the police. He stated that James Tate called Jerome's cell phone, and then Tate arrived at Jerome's house. He testified that he and Tate then drove around for awhile and eventually checked into a motel under an assumed name, where they spent the night. Williams stated that the next morning, he and Tate decided to surrender, and they went to Williams' grandmother's house on Music Street and surrendered to the police there. Williams stated that he did not consider Anderson to be a good friend because Anderson *174 spent too much time in jail. Williams displayed his arms to the jury.
On cross-examination, Williams admitted that his prior conviction was for stolen property. He stated that he knew Everett, but did not know Crump or Ms. Fulton that well. He stated he knew Larry Moses and Tate, but he did not know Brown very well, and he had never been to Brown's house. He testified that he had heard of Hilliard Smith, who was Brown's cousin, and had heard that Smith had been killed, but he insisted that Brown never told him who killed Smith. He denied knowing Jonathan or DeSheila Turner, and he insisted that the State had made the witnesses identify him as one of the shooters. He denied having a gun or ever shooting one.
Williams stated that he had the teardrop tattoos on his face to represent family members who had been killed. He stated that he got the AK-47 and "Ffity N____s" tattoos because Tupac Shakur had one like them. He stated that he got the MOB tattoo because it was the cheapest one he could get at the time. He insisted that he did not know what it or his other tattoos meant. He denied ever being in a red Cutlass or a white Bonneville. He testified that he and Tate went to a motel because there were a lot of police officers in Jerome's neighborhood at the time. He admitted that he turned himself in, but he maintained he was innocent of the crimes for which he was on trial.
A. Errors Patent/Assignment of Error Six
By his final assignment of error, the appellant requests a review of the record for patent errors. Such review reveals there is no minute entry of sentencing contained in the record. However, this is not surprising given the fact that the appellant was sentenced on August 26, 2005, the last day of court before Hurricane Katrina. Nonetheless, the record contains the sentencing transcript which shows the appellant's waiver of his twenty-four-hour delay after the denial of his motion for new trial, the sentences imposed, the multiple bill hearing, and the court's vacating one of the sentences and imposing a sentence on that count as a multiple offender.
There are no other patent errors.
B. Remaining Assignments of Error
I.
By his first assignment of error, the appellant argued that the trial transcript was incomplete because the testimony of several witnesses was missing. After the appellant's original brief was filed, this Court obtained the transcript of the missing witnesses' testimony. In a supplemental brief, the appellant withdrew this assignment.
II.
By the appellant's second assignment of error, he contends that his conviction and sentence must be reversed because portions of voir dire are missing. Specifically, he cites to the in-chambers portions of voir dire, where the attorneys exercised their peremptory challenges and their challenges for cause that were not transcribed and apparently not recorded. The appellant points to his motion for new trial, which alleged among other things that the trial court refused to grant "numerous" challenges for cause during the voir dire, thereby forcing the appellant to use peremptory challenges to remove these biased jurors. His motion for new trial further stated: "All such challenges were objected to at the time of jury selection and are part of the record." At the hearing on the motion for new trial, the court addressed this claim, stating: "I think the record will be clear as to that as *175 well and I'm going to deny that motion." The appellant now argues that his right to a full review of his appeal has been impinged because the in-chambers portion of the voir dire, where he raised the challenges for cause, have apparently been lost and are not available. As counsel was not trial counsel, he makes no argument as to any specific juror who should not have been seated.[9]
The Louisiana Supreme Court addressed the specific issue of missing bench conferences where jury challenges were made. In State v. Pinion, 2006-2346 (La.10/26/07), 968 So.2d 131, the record contained neither transcript of the bench conferences nor any documentation showing which jurors were challenged for cause by the defense or stricken by the defense with peremptory challenges. The Court found that although there was evidence in the record that the defense exhausted its peremptory challenges, the lack of any such documentation as to the challenges for cause prejudiced the defendant, and it reversed the defendant's conviction and sentence. The Court noted that as per La.C.Cr.P. art. 795B(2), peremptory challenges are to be made at the bench and that the court shall not announce to the public which party exercised any particular challenge. In Pinion, although the bench conferences were recorded, the recording malfunctioned, and the Court could not determine who exercised challenges for any particular juror. The Court noted that it had never established an absolute rule as to whether bench conferences had to be recorded as per La.C.Cr.P. art. 843; rather, it had always
conducted a case-specific inquiry to determine whether the failure to record the conferences results in actual prejudice to the defendant's appeal. As a general rule, the failure of the record to reflect the argument of counsel on objections, even when made in open court, does not affect a defendant's appeal because it does not hinder adequate review of the trial court's ruling. [citation omitted] Thus, the failure to record bench conferences will ordinarily not affect the direct review process when the record suggests that the unrecorded bench conferences had no discernible impact on the proceedings and did not result in any specific prejudice to the defendant.
Id. at pp. 7-8, 968 So.2d at 134-135. The Pinion Court found that in that particular case, the missing bench conferences were vital to the defendant's appeal because there were no other documents in the record, such as a list of challenges for cause and peremptory challenges exercised against the prospective jurors, which would have indicated whether the court correctly denied any challenges for cause. The Court stated:
In this particular instance, by operation of art. 795(B)(2), bench conferences are a material part of the proceedings for purposes of La.C.Cr.P. art. 843 and their omission from the present case, given the reasonable likelihood that counsel exhausted his peremptory challenges, the uncertainty with respect to how many cause challenges the defense made unsuccessfully, and the absence of other contemporaneous records accounting for the selection process, e.g., adequate minutes or jury strike sheets, requires reversal of defendant's conviction and sentence.
Id. at p. 10, 968 So.2d at 136. In so ruling, the Court distinguished State v. Deruise, 98-0541 (La.4/3/01), 802 So.2d 1224, where *176 the Court found that the missing bench conferences in which the parties made their challenges for cause and their peremptory challenges did not prejudice the defense because the record contained a jury strike sheet reflecting who challenged each prospective juror, and the transcript of voir dire "revealed a substantial basis for denying a defense cause to the juror, even assuming that the challenge had been made but not preserved in the record." State v. Pinion, at p. 8, 968 So.2d at 135. Here, unlike in Pinion but as in Deruise, the record contains detailed jury sheets that indicate the peremptory strikes for each party as well as those jurors who were excused for cause. In addition, as in Deruise, the transcript of voir dire includes the questioning of each prospective juror, from which it can be determined if there was a basis for any challenges for cause that the defense may have brought and may have been denied by the trial court, thereby causing the defense to exercise a peremptory challenge for a juror. A reading of the transcript of voir dire shows that there was no basis to excuse for cause any of the jurors who ultimately served on the jury or those whom the appellant had to excuse peremptorily. Thus, as in Deruise, the appellant cannot show prejudice from the loss of the in-chambers portions of the voir dire where the defense may have challenged any of these jurors for cause because there was no basis for granting a challenge for cause as to any of the jurors who sat at trial or whom the defense peremptorily excused. Because the appellant cannot show prejudice from the lack of the transcript of these in-chambers conferences, he is not entitled to a new trial on this basis. This claim has no merit.
III. & IV.
The appellant's third and fourth assignments of error are interconnected and will be addressed together. By his third assignment, he contends that he did not receive a fair trial because of the State's repeated references to other murders purportedly committed by him that caused the jury automatically to believe that he was involved in the shooting in this case.[10] By his fourth assignment, he argues that his counsel was ineffective for failing to object to these references to other murders.
In State v. Mims, 97-1500 pp. 44-45 (La.App. 4 Cir. 6/21/00), 769 So.2d 44, 72, this Court discussed the standard to be used to evaluate an effective assistance of counsel claim:
Generally, the issue of ineffective assistance of counsel is more properly addressed in an application for post-conviction relief filed in the trial court, where a full evidentiary hearing can be conducted. State v. Smith, 97-2221, p. 14 (La.App. 4 Cir. 4/7/99), 734 So.2d 826, 834, writ denied, 99-1128 (La.10/1/99), 747 So.2d 1138. Only if the record discloses sufficient evidence to rule on the merits of the claim does the interest of judicial economy justify consideration of the issues on appeal. Id. Here, however, we believe the record is sufficient to address defendant's claims, which are essentially evidentiary.
The defendant's claim of ineffective assistance of counsel is to be assessed by the two-part test announced in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). See State v. Fuller, 454 So.2d 119 (La. 1984). The defendant must show that his counsel's performance was deficient *177 and that this deficiency prejudiced him. The defendant must make both showings to prove counsel was so ineffective as to require reversal. State v. Sparrow, 612 So.2d 191, 199 (La.App. 4 Cir. 1992). Counsel's performance is not ineffective unless it can be shown that he or she made errors so serious that he or she was not functioning as the "counsel" guaranteed to the defendant by the 6th Amendment of the federal constitution. Strickland, supra, at 686, 2064, 104 S.Ct. 2052. That is, counsel's deficient performance will only be considered to have prejudiced the defendant if the defendant shows that the errors were so serious that he was deprived of a fair trial. To carry his burden, the defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 693, 104 S.Ct. at 2068.
See also State v. Crawford, 2002-2048 (La. App. 4 Cir. 2/12/03), 848 So.2d 615.
Here, the references to "other murders" that the appellant now mentions first occurred during the testimony of Laurie White, counsel for Anderson. Defense counsel asked her whether when Anderson identified the appellant he told the police that the appellant had teardrop tattoos on his face. Counsel then asked Ms. White if it was unusual for a young man to have that type of tattoo, and Ms. White replied that it was "a common tattoo among a lot of young defendants." On cross-examination, the prosecutor asked Ms. White the meaning of such tattoos. Defense counsel objected on the ground that any answer she gave would be speculation, and the court ruled that Ms. White could answer the question "if she knows." Ms. White then answered: "I know what I'm told. And . . ." Defense counsel again objected, and the court overruled the objection. Ms. White then testified: "Each teardrop is representative of an individual that has been killed by that person that has the tattoo, because it's a teardrop representative for the tear that each mother sheds for the death of a child." During his testimony, the State cross-examined the appellant about the meanings of the various tattoos he had. On redirect, defense counsel asked the appellant why he had the teardrop tattoos, and the appellant responded: "For, like people that died. . . . That's for like people that died in my family, sir." The appellant then stated that two people in his family had died.
Later, during the State's closing argument, the prosecutor referenced the appellant's teardrop tattoos. The prosecutor noted that the witnesses stated that they only saw marks on the appellant's face and were not able to tell that they were tattoos. The prosecutor then stated: "And you heard from witness Laurie White the exact meaning of those tattoos. The exact meaning of a person wearing those, each represents a previous murder." There was no objection to this statement, but during the defense closing, counsel recounted Ms. White's testimony on the tattoos, noting that Ms. White was Anderson's counsel, and Anderson was formerly also charged with the murder. Counsel then further stated:
But what proof do you have that that's what those marks on Steven Williams  Steven Williams was asked and he meant that's a sign that we put on our  I put on my face to commemorate two people who died in my family. One teardrop for each one that died.
On rebuttal, the prosecutor described the various tattoos the appellant had and noted that defense counsel and the appellant tried to minimize the effect of the *178 tattoos, but the prosecutor theorized that the appellant got the AK-47 tattoo, the teardrop tattoos, and the "MOB" tattoos to show people on the street that he was a killer. The prosecutor then compared the teardrop tattoos to the real tears shed by the victim's mother and the witnesses to the shooting, ending with: "And, ladies and gentlemen, those two teardrops don't hold a candle to the rivers of tears shed by this community who to this day cannot believe that something like this would happen in a school."
The appellant now argues that these references to the tattoos and the meaning behind the tattoos were references to other murders supposedly committed by him. However, a reading of Ms. White's testimony, where the meaning of the tattoos was first raised, shows that defense counsel opened the door when he asked Ms. White on direct examination if teardrop tattoos were uncommon in young men the appellant's age. This led to the question by the prosecutor about the meaning of the tattoos. Ms. White testified that she "was told" that they signified one tear for each victim killed by the wearer and that she did not know of any other explanation. Her testimony, however, did not preclude a different reason for the tattoos. Indeed, the appellant explained at trial that he wore them to commemorate two members of his family who had been killed. We do not find that Ms. White's testimony on this point was a reference to other murders committed by the appellant. There was no evidence adduced at trial of any other killing that purportedly had been committed by the appellant. The only other murder mentioned in the case was that of Hilliard Smith, and the only intimation of who committed that murder was that Jonathan had killed Smith, and he in turn was killed in retaliation. The appellant's explanation of why he had the tattoos was just as plausible as Ms. White's explanation of their meaning, which she admitted was only something that she had been told in the past. She also agreed that such tattoos were common in young men. Given these factors and the appellant's own plausible explanation for the tattoos, it appears that Ms. White's testimony was not an improper reference to other crimes committed by the appellant.
The State further notes that counsel was not ineffective for raising the issue of the teardrop tattoos with Ms. White. Counsel asked her about the tattoos to elicit evidence that these types of tattoos were common in young men, not limited to only the appellant. As noted in State v. Griffin, XXXX-XXXX, pp. 9-10 (La.App. 4 Cir. 1/15/03), 838 So.2d 34, 40:
This Court has recognized that if an alleged error falls "within the ambit of trial strategy" it does not "establish ineffective assistance of counsel." State v. Bienemy, 483 So.2d 1105 (La.App. 4 Cir. 1986). Moreover, as "opinions may differ on the advisability of a tactic, hindsight is not the proper perspective for judging the competence of counsel's trial decisions. Neither may an attorney's level of representation be determined by whether a particular strategy is successful." State v. Brooks, 505 So.2d 714, 724 (La.1987).
See also State v. Myers, XXXX-XXXX (La. App. 4 Cir. 11/3/04), 888 So.2d 1002. Here, counsel's initial questioning about the tattoos can be seen as trial strategy, which cannot establish ineffective assistance of counsel.
The remainder of this claim revolves around the State's references in its closing and rebuttal arguments to these tattoos. In State v. Clark, 2001-2087, p. 15 (La.App. 4 Cir. 9/25/02), 828 So.2d 1173, 1183, this court set forth the standard for determining whether a prosecutor's *179 remarks are so prejudicial as to warrant a new trial:
The scope of closing argument "shall be confined to evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law applicable to the case. The argument shall not appeal to prejudice. The state's rebuttal shall be confined to answering the argument of the defendant." La.C.Cr.P. art. 774. Prosecutors may not resort to personal experience or turn argument into a plebiscite on crime. State v. Williams, 96-1023, p. 15 (La.1/21/98), 708 So.2d 703, 716. However, prosecutors have wide latitude in choosing closing argument tactics. State v. Casey, 99-0023, p. 17 (La.1/26/00), 775 So.2d 1022, 1036, citing State v. Martin, 539 So.2d 1235, 1240 (La.1989) (closing arguments that referred to "smoke screen" tactics and defense as "commie pinkos" were deemed inarticulate but not improper). Further, the trial judge has broad discretion in controlling the scope of closing arguments. Id. Even if the prosecutor exceeds the bounds of proper argument, a reviewing court will not reverse a conviction unless "thoroughly convinced" that the argument influenced the jury and contributed to the verdict. State v. Ricard, 98-2278, p. 4 (La.App. 4 Cir. 1/19/00), 751 So.2d 393, 397. Even where the prosecutor's statements are improper, credit should be accorded to the good sense and fairmindedness of the jurors who have heard the evidence. Williams, supra; Ricard, supra.

Here, in the reference during closing argument, the prosecutor merely reiterated what Ms. White had testified to about the meaning of the tattoos. As such, the reference was within the scope of the closing argument. During rebuttal, the prosecutor again mentioned all three of the appellant's tattoos, and he commented on the teardrop tattoos in response to defense counsel's argument about why the appellant had those tattoos. The prosecutor's remaining argument on the subject of the tattoos was merely to compare them to the tears shed by the victim's mother, the witnesses, and the public in general in reaction to the school shooting. As such, we do not see how these statements were references to other murders committed by the appellant. Instead, they constituted argument based upon the evidence adduced at trial. Therefore, defense counsel did not err by failing to object to them.
Contrary to the appellant's argument, the trial court did not err in failing to grant a mistrial based on this testimony and this argument because counsel did not request a mistrial. See C.Cr.P. arts. 770 and 775. State v. Martello, 98-2066 (La. App. 4 Cir. 11/17/99), 748 So.2d 1192; State v. Cager, 97-1877 (La.App. 4 Cir. 3/24/99), 732 So.2d 97. Nonetheless, because there was no error in admitting Ms. White's testimony or in the prosecutor's argument, counsel did not err by failing to object to them and move for a mistrial.
Given Anderson's testimony and the eyewitness testimony of Ms. Turner, Ms. Thomas, and Ms. Parker, and the identifications in this case, no error resulting from the introduction of this evidence improperly influenced the jury and improperly contributed to the verdict. As such, their introduction was harmless. Because they are harmless, the appellant cannot show prejudice. Without a showing of prejudice, his ineffective assistance of counsel claim fails. Therefore, assignments of error three and four are without merit.
V.
In the appellant's remaining assignment of error, he contends that counsel was ineffective for failing to object to *180 repeated State references to his tattoo which spelled out "Fifty N____s." The appellant argues that these references were direct impermissible references to race, which would have entitled him to a mistrial if counsel had objected to them. The standard for determining an ineffective assistance of counsel claim is set out in the discussion of the last two assignments of error.
The appellant had the tattoos "AK-47" and "Fifty N____s" on his neck. They were in plain view of the jury, and in fact during direct examination, defense counsel asked the appellant to display to the jury all of his tattoos. On cross-examination, the State asked the appellant the significance of not only this tattoo, but also the teardrop tattoos under his eye and the tattoo "MOB" in script on his arm. With respect to the "AK-47" and "Fifty N____s" tattoo, the appellant testified that he got this tattoo because Tupac Shakur had one like it. When the appellant testified that he did not know the meaning of the tattoo, the State produced a picture of Tupac Shakur with the tattoo, as well as a song featuring the lyrics "Fifty N____s Deep." The appellant maintained that he did not know the meaning of the tattoo.
The prosecutor's questioning necessarily contained the racial slur because the tattoo about which he questioned the appellant contained that slur. The tattoo containing the slur was prominently displayed to the jury. Apparently the prosecutor's questions concerning the appellant's various tattoos were designed to show that the appellant was the type of person to have and use a gun. Indeed, during rebuttal, the prosecutor stated that the appellant had his various tattoos to show everyone "what kind of man he is," and that the appellant got the tattoo of a gun "that is manufactured for the specific purpose of killing someone . . . as a symbol for everyone to see that Steven Williams is a killer." Thus, the references were not made for a racial purpose, but rather they were references to tattoos that the appellant had and that were clearly visible to the jury. As such, there was no reason for counsel to request a mistrial. In any event, as with the preceding assignments of error, any potential error in allowing this cross-examination was harmless in that it cannot be said that it improperly influenced the jury and improperly contributed to the verdict. This assignment also has no merit.
Because there is no merit to the appellant's assignments of error, we affirm the appellant's convictions and sentences.
AFFIRMED.
NOTES
[1] Also charged in this count were James Tate, Raymond Brown, and Michelle Fulton. The State ultimately nolle prosequied the charge against Brown and Fulton, and Tate pled guilty to an amended charge of manslaughter.
[2] Also charged in this count were Tate, Brown, Fulton, Arthur Francis, Tyrone Crump, and Herbert Everett. Everett, Fulton, and Tate eventually pled guilty as charged. Crump pled guilty to an amended charge to accessory after the fact to second degree murder. The State nolle prosequied the charge against Francis and Brown.
[3] Tate was also charged in this count. The State later nolle prosequied the charge as to Tate.
[4] Tate was also charged in this count. The State later nolle prosequied the charge as to Tate.
[5] Tate was also charged in this count. The State later nolle prosequied the charge as to Tate.
[6] The 911 tape was played for the jury.
[7] Detective Small must have meant Chanisha Parker, who testified later at trial.
[8] The State played this 911 tape.
[9] Because the appellant exhausted his peremptory exceptions, he would be entitled to raise an assignment of error as to the erroneous denial of a challenge for cause. See State v. Carmouche, XXXX-XXXX,(La.5/14/02), 872 So.2d 1020.
[10] The appellant made this argument in his motion for new trial. The court denied this claim, noting that defense counsel "opened the door" with the witness by asking her about the tattoos.